| | |
|---|---|
| SLEC, LLC, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | Case No. 4:18-cv-01377-JAR |
| ) | |
| ASHLEY ENERGY, LLC, et al., ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on Defendants' Motion to Dismiss. (Doc. 39.) The motion is fully briefed and ready for disposition. (Docs. 40, 49, 54.) Also before the Court are a motion by Plaintiff law firm Davis & Garvin, LLC's ("D&G") Motion to Sever (Doc. 63), which Defendants oppose (Doc. 67), and a motion by Plaintiffs to take judicial notice (Doc. 61), which Defendants do not oppose. Finally, Plaintiffs move for leave to file a second amended complaint. (Doc. 82.) Defendants oppose. (Doc. 85.)

### Background[1]

In July 2015, Plaintiff SLEC, LLC, acquired an option to purchase the Ashley Power Plant in St. Louis, Missouri, from Trigen-St. Louis Energy Corporation. SLEC and Plaintiff Michael Becker[2] hired Plaintiff law firm Davis & Garvin, LLC ("D&G") to represent SLEC throughout the "negotiation, acquisition and closing" of the purchase "and such matters related

---

[1] The Court will grant Plaintiffs' Motion to Take Judicial Notice. (Doc. 61.) Plaintiffs ask the Court to take notice of certain filings from *Power Investments, LLC v. SLEC, LLC*, No. 5:18-cv-00466 (E.D. Ky 2019), and the facts contained therein. Under Federal Rule of Evidence 201, the Court may take judicial notice of facts not subject to reasonable dispute, including filings from other courts. Defendants do not oppose.

[2] It is not clear from Plaintiffs' complaint but the Court infers from their allegations that Becker is an officer of SLEC.

thereto." (Doc. 25-1 at ¶ 11.) SLEC signed a fee agreement with D&G that called for hourly compensation plus reimbursement for costs and expenses (the "Fee Agreement"). SLEC then formed Defendant Ashley Energy, LLC, ("Ashley") for the purpose of buying the power plant and assigned to it SLEC's purchase option. SLEC directed D&G to represent Ashley as the buyer.

In May 2016, SLEC began communicating with Defendant Power Investments, LLC ("PI"), a Nevada corporation, about financing the purchase of the power plant in exchange for equity in its ownership. PI's only member is Defendant Mason Miller, a lawyer living in Kentucky. PI obtained a term sheet from a private equity firm called Arena Investors, LP, and thereafter SLEC and Becker, represented by D&G, entered into a Membership Interest Purchase Agreement ("MIPA") with PI. (Doc. 44.) PI agreed to purchase SLEC's entire ownership interest in Ashley—including the right to purchase the power plant—in exchange for two payments totaling $1.7 million. (*Id.*) In addition, the MIPA provided for the release by PI of a separate, personal loan it had made to Becker. (*Id.*)

On August 10, 2017, Ashley, whose sole member at this point was PI, closed on the acquisition of the power plant. As the sole person authorized to access Ashley's bank account, Becker transferred nearly $480,000 to Miller and his Kentucky law firm Defendant Miller Wells, which represented PI in the purchase. Ashley borrowed approximately $8.5 million from Arena Investors to buy the plant.

Following the sale of the power plant, the parties began arguing over money. In the weeks following the purchase, PI made two cash payments to Becker and delivered an unexecuted copy of the note for his personal loan, marked "paid in full," which together represented the full amount of the initial payment due under the MIPA. Since then, no other payments have been made.

2

Plaintiffs argue that Defendants still owe the full amount of the second payment as well as legal fees for work D&G performed on behalf of Ashley Energy. Around the same time, Defendants came to believe that Plaintiffs had misrepresented the financial state of the power plant and that Becker had misused loan funds.

On October 19, 2017, D&G partner Dan Davis emailed Miller, seeking to informally resolve their dispute. (Doc. 60-1.[3]) He stated that, if the parties could not find a resolution by 5:00 p.m. on October 26, 2019, he intended to file the attached draft petition. (*Id.*) The next day, Miller responded, thanking Davis for his willingness to informally resolve the matter, expressing his hope that they could do so, and closing with "Litigation is just going to get messy, and I'd prefer to spend my time making the steam plant a success." (Doc. 60-2.) Then, on October 25, 2017, the day before Davis's stated deadline for an informal resolution, PI sued SLEC and Becker in Kentucky state court, advancing claims of fraud and unjust enrichment (the "Kentucky Action"). (*See* Doc. 15 at 2.) Two days later, on October 27, 2017, Plaintiffs filed suit in Missouri state court, arguing that Defendants had breached the MIPA and Fee Agreement (the "First Missouri Suit"). (Doc. 15 at 1.)

Defendants removed the First Missouri Suit to this Court on November 22, 2017. (Doc. 1 in *SLEC*, No. 4:17-cv-02751-JAR [hereinafter *SLEC I*]). On December 5, 2017, the Fayette Circuit Court of Kentucky entered a default judgment in the Kentucky Action. (*SLEC I*, Doc. 1.) Roughly one month later, Defendants moved to dismiss the First Missouri Suit on the grounds that Plaintiffs failed to state a claim and that four of the five counts were barred by res judicata based on the default judgment in Kentucky state court. (*SLEC I*, Docs. 19, 20.) On May 14, 2018, Plaintiffs filed a motion in the First Missouri Suit to voluntarily dismiss Count I of their

---

[3] Defendants do not challenge the authenticity or use of this or other communications in response to their motion to dismiss. (*See* Doc. 66.)

complaint and, that same day, this Court granted Defendants' motion and dismissed the remaining claims without prejudice. (*SLEC I*, Docs. 32, 33.) In the interim, Plaintiffs had filed a motion to set aside the default judgment in the Kentucky Action. (*See SLEC I*, Doc. 29 at 1-2.)

On June 22, 2018, the Fayette Circuit Court granted Plaintiffs' motion to set aside the default and reinstated the Kentucky Action. (*See* Doc. 15 at 2.) Becker subsequently removed the suit to the Eastern District of Kentucky on July 24, 2018, and moved to dismiss for lack of personal jurisdiction. (*See* Doc. 15 at 2.)

On July 30, 2018, Plaintiffs filed suit a second time in Missouri state court, alleging breach of contract and fraudulent conveyance and seeking to pierce the corporate veil and to force the imposition of a constructive trust. (Doc. 8.) Defendants removed to federal court on August 20, 2018, and the case is now before this Court. (Doc. 1.)

In the interim, the District Court of the Eastern District of Kentucky dismissed the Kentucky Action for lack of personal jurisdiction. *See Power Investments, LLC v. SLEC, LLC*, No. 18-6098 (6th Cir. June 20, 2019). PI appealed. *Id.* On June 20, 2019, the Sixth Circuit Court of Appeals issued an opinion reversing the district court's dismissal, finding that Becker's contacts with Miller and Miller Wells were sufficient to subject him to suit in Kentucky. *Id.* The case was remanded to the Eastern District of Kentucky and is currently stayed pending the outcome of this motion to dismiss. (*See* Doc. 60-4.)

Initially, Defendants argued that all of Plaintiffs' claims are barred by the express language of the Fee Agreement or MIPA, or else fail on their merits as a matter of law. (*Id.*) In their supplemental briefing, Defendants add that, since the Kentucky Action has been reinstated, this Court need not reach the merits and can instead dismiss this case under the first-filed doctrine or the compulsory-counterclaim rule. (Doc. 59.)

4

## Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955 (alteration in original) (citations omitted). "When ruling on a motion to dismiss [under Rule 12(b)(6)], the district court must accept the allegations contained in the complaint as true and all reasonable inferences from the complaint must be drawn in favor of the nonmoving party." *Young v. City of St. Charles*, 244 F.3d 623, 627 (8th Cir. 2001).

## Discussion

### *The First-Filed Doctrine*

Defendants argue that this Court should dismiss Plaintiffs' suit before reaching the merits because the Kentucky Action established federal jurisdiction in the Eastern District of Kentucky before Plaintiffs filed suit in this district. (Doc. 59 at 3-8.) "To conserve judicial resources and avoid conflicting rulings, the first-filed rule gives priority, for purposes of choosing among possible venues when parallel litigation has been instituted in separate courts, to the party who first establishes jurisdiction." *Nw. Airlines, Inc. v. Am. Airlines, Inc.*, 989 F.2d 1002, 1006 (8th Cir. 1993) (citing *U.S. Fire Ins. Co. v. Goodyear Tire & Rubber Co.*, 920 F.2d 487, 488 (8th Cir.

5

1990)). Plaintiffs do not dispute that this case substantially overlaps with the Kentucky Action. (*See* Doc. 60.)

Ordinarily, a simple analysis of the dates each suit was filed is sufficient to determine which court should proceed. However, the rule "yields to the interests of justice, and will not be applied where a court finds 'compelling circumstances' supporting its abrogation." *Id.* (quoting *Goodyear*, 920 F.2d at 488. Courts look for "red flags" that counsel against honoring the first-filed doctrine. *Id.* For instance, when the first-filed suit was initiated after notice that the other party was planning to sue, courts are suspicious of a potential race to the courthouse that often indicates disfavored forum-shopping. *Anheuser-Busch, Inc. v. Supreme Int'l Corp.*, 167 F.3d 417, 419 (8th Cir. 1999). This suspicion increases when the other party communicates a specific and imminent date on which it intends to file suit. *See Nw. Airlines*, 989 F.2d at 1007. In addition, courts are leery of first-filed suits for declaratory judgment, which "may be more indicative of a preemptive strike than a suit for damages or equitable relief." *Id.*

Plaintiffs argue both red flags are present here: Davis stated his intention to file suit if the parties could not informally resolve their issues and provided a specific deadline for doing so. (Doc. 60-1.) Miller expressed his desire to avoid litigation and agreed to work towards an informal resolution. (Doc. 60-2.) Miller then filed suit in Kentucky the day before Davis's stated deadline without notifying the Plaintiffs. (Docs. 59-1, 60 at 5.) Plaintiffs filed suit in Missouri the next day.

The Court finds this timeline of events extremely concerning and suspicious. Not only were Defendants on notice that Plaintiffs intended to file suit, they knew the exact date and had a copy of the petition. Additionally, Miller stated an affirmative intention to avoid litigation and then filed suit without notifying Plaintiffs that his position had changed. Finally, Defendants seek a declaratory judgment in the Kentucky Action, further increasing the Court's suspicion of a

preemptive strike. In short, the Court believes there are compelling circumstances not to apply the first-filed doctrine.

Defendants reply that this suit was initiated nine months after they filed the Kentucky Action, undermining any claim of a race to the courthouse. (Doc. 66 at 1.) They note Plaintiffs' assertion that this suit is a continuation of the First Missouri Suit, but argue that Plaintiffs' voluntary dismissal of the First Missouri Suit precludes such treatment. (*Id.* at 1-2.) Citing *Quickturn Design Sys., Inc. v. Meta Sys.*, No. C-96-0881 MHP, 1996 WL 671230 (N.D. Cal. Oct. 31, 1996), and *Sandstrom v. ChemLawn Corp.*, 904 F.2d 83 (1st Cir. 1990), Defendants argue that a case voluntarily dismissed "cannot be the basis of the application of an exception to the first-filed rule." (*Id.* at 2.)

The Court finds both cited cases distinguishable. *Quickturn* involved a patent dispute between Quickturn Design Systems and Mentor Graphics, among others. 1996 WL 671230, at *1. First, Mentor filed suit in the Northern District of California. *Id.* Then, Quickturn brought suit in the International Trade Commission. *Id.* Mentor voluntarily dismissed the California suit and almost immediately refiled in the District of Oregon. *Id.* Mentor sought to avoid the first-filed doctrine by claiming the Oregon suit was merely a continuation of the California suit. *Id.* In effect, Mentor was arguing that the Oregon suit was filed before Quickturn's ITC complaint.

Unlike Mentor, Plaintiffs in this case are not attempting to reach back past the Kentucky Action and argue that the First Missouri Suit was the first filed. Instead, they are asserting that the Court should consider the date of the First Missouri Suit as evidence supporting their argument that the first-filed doctrine should not be applied.

*Sandstrom* is even less like this case. In fact, it does not even apply the first-filed doctrine. Defendants apparently cite it for the narrow proposition that "a voluntary dismissal under Fed.R.Civ.P. 41(a) wipes the slate clean, making any future lawsuit based on the same

7

claim an entirely new lawsuit unrelated to the earlier (dismissed) action." *Sandstrom*, 904 F.2d at 86. Even then, the First Circuit's statement related to the defendants' acquiescence to jurisdiction in the first suit, not the timing of the cases. Considering the issue, the court wrote:

> Even if we assume, contrary to the record, that there was some intimation in the course of *Sandstrom I* that ChemLawn would not contest personal jurisdiction in Maine, any such commitment would be irrelevant to the situation in *Sandstrom II*. Absent explicit conditions to the contrary—and there were none here—a voluntary dismissal under Fed.R.Civ.P. 41(a) wipes the slate clean, making any future lawsuit based on the same claim an entirely new lawsuit unrelated to the earlier (dismissed) action. *See Hill v. W. Bruns & Co.,* 498 F.2d 565, 567 n. 2 (2d Cir.1974); *Bomer v. Ribicoff,* 304 F.2d 427, 428 (6th Cir.1962); *Bryan v. Smith,* 174 F.2d 212, 214 (7th Cir.1949); *see also* 9 C. Wright & A. Miller, Federal Practice and Procedure: Civil § 2367 at 186 (1971). Agreements do not automatically survive from one suit to the next.

*Id.* As such, *Sandstrom* is of little help in solving the particular problem presented in this case, namely whether Plaintiffs' voluntary dismissal requires the application of the first-filed doctrine.

Plaintiffs also note that courts often find compelling circumstances to avoid the first-filed doctrine when the second-filed suit is in a far more convenient forum. This "balance of convenience" exception applies "where an analysis under 28 U.S.C. § 1404(a) dictates transfer." *Barry-Wehmiller Companies, Inc. v. Marschke*, No. 4:09CV760 TIA, 2009 WL 3698009, at *2 (E.D. Mo. Nov. 2, 2009) (citing *Terra Int'l, Inc. v. Mississippi Chem. Corp.*, 922 F. Supp. 1334, 1348–49 (N.D. Iowa 1996), *aff'd,* 119 F.3d 688 (8th Cir. 1997)). Section 1404(a) reads: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought . . . ."

Plaintiffs argue that Missouri is the appropriate venue for numerous reasons: Both suits relate to the sale of a power plant situated in Missouri and owned by a Missouri LLC whose sole member was another Missouri LLC; Plaintiffs are two Missouri LLCs, and a Missouri citizen; the promissory note and deed involved in the transfer both state that they are to be interpreted under Missouri law; the trustee of the deed was a Missouri LLC headquartered in St. Louis; the

8

MIPA is governed by Missouri law; and Miller is the registered agent for both the trustee and Ashley, listing two separate St. Louis addresses. (Doc. 60 at 8) In addition, Plaintiffs note that the wire transfers at issue in this case were initiated at Missouri banks and that nearly every potential witness other than Miller resides in Missouri. (*Id.*)

The Court first notes its concern regarding Plaintiffs' proposed path forward. If the Court denies Defendants' motion to dismiss, this case and the Kentucky Action will proceed as parallel suits with the potential for inconsistent or even contradictory outcomes. Avoiding that risk is the very purpose of the first-filed doctrine. *Nw. Airlines, Inc.*, 989 F.2d at 1006.

That said, the Court is somewhat unsympathetic because it believes that the risk is the result of Defendants' gamesmanship in filing the Kentucky Action while on notice of, and only two days before, Plaintiffs' stated intent to bring suit in Missouri. The Court is not persuaded by Defendants' arguments regarding the voluntary dismissal of the First Missouri Suit or the intervening months before this suit was filed. Put simply, those facts have no bearing on the propriety of Defendants' conduct, and the Court will not punish Plaintiffs for relying on Miller's reassurances. Further, the Court understands that Kentucky Action is currently stayed pending the outcome of this motion, which significantly reduces the risk of conflicting rulings by allowing the parties to proceed in that case with full knowledge of where this case stands.

Ultimately, the Court concludes that the factors listed in § 1404(a) largely favor Missouri as the more-convenient venue. Of particular note, all but one of the parties is closely related to Missouri. SLEC, D&G, and Ashley are Missouri entities with Missouri headquarters. Becker is a Missouri resident. Miller lives in Kentucky but is the registered agent for two Missouri entities at two different Missouri addresses. PI is a Nevada entity but Miller is its sole member and it is the sole member of Ashley, giving it two strong connections to Missouri. Finally, Miller Wells is a Kentucky law firm with no apparent connection to Missouri other than Miller. In addition,

9

the subject matter of the lawsuit is in Missouri: this is a contract dispute arising from the sale of a St. Louis power plant. The parties to the contract chose Missouri law. The deed and promissory note are to be interpreted under Missouri law. Likewise, the witnesses are in Missouri: the banks from which the money was transferred are located here, Becker lives here, and Miller has two addresses here. Finally, even if the Court dismissed this suit as second-filed, it would have to sever D&G's claims because it is not a party to the Kentucky Action. In other words, this case will go forward regardless of the Court's ruling on Defendants' motion to dismiss. Accordingly, the Court concludes that there are compelling circumstances to avoid the first-filed doctrine and will not dismiss Plaintiff's suit on that basis.

Defendants suggest, as an alternative to dismissal, transfer to the Eastern District of Kentucky for consolidation with the Kentucky Action. (Doc. 59 at 10.) The Court finds that alternative unacceptable for the same reasons discussed above: the Kentucky Action is the result of what appears to this Court to be gamesmanship and is the less-convenient forum. As such, the Court will deny that request as well.

### *The Compulsory-Counterclaim Rule*

Defendants also argue that this case must be dismissed because Plaintiffs' arguments are compulsory counterclaims that must be raised in the Kentucky Action. (Doc. 59 at 8-9.) Federal Rule of Civil Procedure 13 governs compulsory counterclaims:

A pleading must state as a counterclaim any claim that—at the time of its service—the pleader has against an opposing party if the claim . . .arises out of the transaction or occurrence that is the subject matter of the opposing party's claim; and does not required adding another party over whom the court cannot acquire jurisdiction.

Fed. R. Civ. P. 13(a)(1). Missouri has an identical rule, Missouri Supreme Court Rule 55.32(a), which "functions 'as a means of bringing all logically related claims into a single litigation, through the penalty of precluding the later assertion of omitted claims.'" *Bankcard Sys., Inc. v.*

10

*Miller/Overfelt, Inc.*, 219 F.3d 770, 773 (8th Cir. 2000) (citing *State ex rel. J.E. Dunn, Jr. & Assocs., Inc. v. Schoenlaub*, 668 S.W.2d 72, 75 (Mo. 1984)). There can be no dispute that Plaintiffs' claims arise out of the same transaction or occurrence that is the subject matter of the Kentucky Action.

For their part, Plaintiffs argue that the case was stayed before their answer was due and that therefore they are not, as of now, compelled to raise the claims advanced in this case. (Doc. 60 at 13-14.) In addition, they argue that Defendants' alleged misconduct and the greater convenience of trying the case in Missouri outweigh the judicial efficiency created by rigid application of Rule 13. (*Id.*) Finally, they assert that, because D&G is not a party in the Kentucky Action, they cannot raise a counterclaim in that suit. (*Id.* at 14.)

The Court agrees with Plaintiffs that any compulsory counterclaim in the Kentucky Action is on hold as long as the case is stayed. Until that case is reopened, Plaintiffs need not fulfill the requirements of Rule 13, and, accordingly, this Court concludes that it need not address the argument at this point in time.

### *The Merits*

### Count I:  Breach of Contract - D&G against Ashley Energy

In its first count, D&G alleges that Ashley Energy owes it some $156,263.50 in legal fees, as well as interest and costs, under the terms of the Fee Agreement. (Doc. 36 at ¶¶ 59-61.) Ashley responds that it was not a party to the Fee Agreement and that, in any event, D&G's claim is barred by the terms of the MIPA.

The Fee Agreement between SLEC and D&G obligated the former to pay the latter for fees and costs incurred during the preparation for and purchase of the power plant. As part of that preparation, SLEC created Ashley. Becker, acting as an officer of SLEC, which in turn was the sole member of Ashley, orally authorized D&G to represent Ashley in the purchase of the power

11

plant and thereby assumed, on behalf of Ashley, SLEC's obligation to pay D&G according to the Fee Agreement. D&G argues that Ashley breached the Fee Agreement by refusing to pay D&G's legal fees and costs.

Ashley argues that it is not bound by the Fee Agreement because it is not a party to the Fee Agreement and did not exist when the Fee Agreement was signed. (Doc. 40 at 5.) D&G concedes that Ashley was not a named party to the Fee Agreement but argues that it is nonetheless obligated to pay based on Becker's verbal acceptance. (Doc. 49 at 2.) It notes that, under Missouri law, "[a] signature is not essential to the binding force of an agreement." (Doc. 49 at 2 (quoting *Weitz Co. v. MH Washington*, 631 F.3d 510, 519 (8th Cir. 2011).

As additional support, D&G proffers an email sent while negotiating the MIPA on behalf of SLEC, which stated that SLEC's acceptance of the MIPA was conditioned on the assumption of a list of obligations by PI, including the payment of D&G's legal fees. (Doc. 49 at 5.) That email read:

> I have attached the signature pages for the . . . [MIPA] as evidence of our general agreement on the terms offered by [PI] to purchase the interest of [SLEC] in [Ashley]. As we discussed, there are still some areas that require further refinement but, due to the time limitations, will have to be addressed as time and priorities permit. With that in mind, let me set forth the issues which we feel still require some further agreement:
>
> . . .
>
> 6. We have discussed the vendors who are entitled to payment from Ashley and/or SLEC in connection with the closing of the sale. We can attach an exhibit which lists the vendors and amounts. PI has agreed to assume these obligations of Ashley as part of the membership purchase. These include . . . Dan Dennis [of D&G].
>
> . . .
>
> 8. We agreed that legal fees for [D&G] and Miller Wells would be paid at closing depending on the amount of available funds.
>
> . . .

12

We are delivering the signature pages with the condition that the above accurately reflects our agreement and that these additions and/or changes will be made to the final draft of the [MIPA].

(Doc. 25-8 at 1-2.) Miller responded with a one-line email that read: "Agreed and confirmed."

(Doc. 25-12.)

Still, Ashley argues that, even if it was bound by the Fee Agreement based on Becker's verbal assumption of SLEC's obligation, and even if Miller's email was a ratification of that assumption, that obligation is superseded by the terms of the MIPA. For instance, the parties did, as contemplated in the email, attach an exhibit listing the vendors and amounts PI was assuming. Paragraph 1.G of the MIPA reads:

As part of the consideration paid to the SLEC parties for the sale . . . Ashley Energy does hereby agree to accept and assume responsibility for the payment of certain obligations and expenses incurred by the SLEC parties in connection with the acquisition of the Ashley Power Plant. The names of the vendors and amounts due are set forth on the attached Exhibit A.

(Doc. 44 at ¶ 1.G.) Ashley notes that Exhibit A does not include D&G's legal fees and that therefore the obligation was never assumed. (*Id.* at 9.)

Ashley bolsters its argument by citing the MIPA's integration and release clauses.

Paragraph 7 of the MIPA reads:

This Agreement, along with any exhibits, constitutes the entire agreement between the Parties hereto, and there are no representations, warranties or other statements or promises that are made by any party to the other in connection with this Agreement."

(Doc. 44 at ¶ 7.) Paragraph 2 of the MIPA reads:

[T]he Parties, on behalf of themselves, their members, successors, assigns, *attorneys*, . . . directors, officers, employees, and agents . . . forever release . . . the other Parties . . . from any and all past, present, or future demands, actions, causes of action, rights, matters, suits, sums of *money, damages, and compensation* of any nature, by reason of and/or related to [the purchase of the Ashley Power Plant].

(Doc. 44 at ¶ 2 (emphasis added).)

13

Ashley asserts that, under Missouri law, "[a] written contract is presumed to be 'the final memorial of the parties' agreement and an integration clause further confirms the all-inclusive nature of the document.'" *Jennings v. SSM Health Care St. Louis*, 355 S.W.3d 526, 532 (Mo. Ct. App. 2011) (quoting *RLI Ins. Co. v. Southern Union Co.*, 341 S.W.3d 821, 830 (Mo. Ct. App. 2011)). Further, "the 'law conclusively presumes all prior and contemporaneous agreements have been merged into a written contract,' particularly when the contract contains an integration clause." *Id.* (quoting *Clean Uniform Co. St. Louis v. Magic Touch Cleaning, Inc.*, 300 S.W.3d 602, 611 (Mo. Ct. App. 2009)). Thus, Ashley argues, any earlier agreement that was not reduced to writing and included in Exhibit A—including Ashley's assumption of SLEC's obligation to pay D&G under the Fee Agreement based on Becker's verbal assent—is no longer binding on it.

In response, D&G first argues that Exhibit A is not properly before the Court at this stage and that the version of Exhibit A that Defendants submitted with its motion does not represent the final list of assumed obligations. (Doc. 49 at 4-5.) It asserts that, "the full listing of obligations that Ashley was to satisfy was agreed to by the parties, in writing, through their correspondence." (*Id.*) As to the clauses within the MIPA, D&G argues that neither it nor Ashley is a party to the MIPA and that therefore neither released the other of any obligation. (Doc. 49 at 5-6.) D&G further dismisses the integration clause on the ground that the email exchange took place the day after the MIPA's effective date, meaning the integration clause— which relates only to prior-made agreements—has no effect on Ashley's later assumption of the obligation to pay D&G. (*Id.*)

At this stage, accepting as true D&G's factual allegations, the Court finds that D&G has a facially plausible claim for breach of contract. The Court agrees with D&G that the version of Exhibit A submitted by Defendants is not properly before it at this time. Generally, "matters

14

outside the pleading may not be considered in deciding a Rule 12 motion to dismiss," but "documents necessarily embraced by the complaint are not matters outside the pleading." *Ashanti v. City of Golden Valley*, 666 F.3d 1148, 1151 (8th Cir. 2012) (quoting *Enervations, Inc. v. Minn. Mining & Mfg. Co.*, 380 F.3d 1066, 1069 (8th Cir. 2004)). However, even documents embraced by the complaint should not be considered when their authenticity is in question. *Id.* Here, there is a debate as to whether the Exhibit A proffered by Defendants is a full and accurate representation of the parties' understanding and intent at the time the MSA was signed. Because the authenticity of Exhibit A is in question, the Court will not consider it a basis to dismiss Count I.

Further, the Court could reasonably infer from the email—which, unlike Exhibit A, is unquestionably authentic—that Ashley is bound under the Fee Agreement to pay D&G's legal fees, either by virtue of Becker's verbal agreement or as incorporated into the MIPA by Miller's email. Ashley's arguments to the contrary are insufficient to prevent D&G from clearing the low bar present at the motion-to-dismiss stage. The Court will therefore deny Ashley's motion to dismiss Count I.

## Count II: Equitable Estoppel - D&G against Ashley Energy

In Count II, D&G seeks an order from this Court holding that Ashley "is equitably estopped from denying the agreement to pay D&G as required under the Fee Agreement." (Doc. 25-1 at ¶ 73.)

As an initial matter, the Court believes that Count II is mislabeled. Equitable estoppel seeks to remedy "the unfairness of permitting a party to belatedly assert rights if he knew of those rights but took no steps to enforce them until the other party has, in good faith, become disadvantaged by changed conditions." *TAMKO Bldg. Prod., Inc. v. Factual Mut. Ins. Co.*, 890

15

F. Supp. 2d 1129, 1139 (E.D. Mo. 2012) (quoting *Stenger v. Great S. Sav. & Loan Ass'n*, 677 S.W.2d 376, 383 (Mo. Ct. App. 1984)). Meanwhile, "[a] claim is more appropriately analyzed under the doctrine of promissory estoppel, not equitable estoppel, where representations upon which the plaintiff allegedly relied are more akin to statements of future intent than past or present fact." *Bracewell v. U.S. Bank Nat. Ass'n*, 748 F.3d 793, 796 (8th Cir. 2014) (quoting 28 Am. Jur. 2d *Estoppel & Waiver* § 34 (2014)).

In its complaint, D&G argues that Ashley is attempting to assert a lack of contractual privity between the two entities to invalidate its obligation under the Fee Agreement, despite multiple emails in which Miller recognized Ashley's duty to pay D&G. (Doc. 25-1 at ¶ 69.) While that could arguably be described as the belated assertion of Ashley's rights, the Court believes that the nature of D&G's claim is that it relied on Ashley's stated future intent to pay for D&G's legal services. *Bracewell*, 748 F.3d at 796; *see also Wages v. Young*, 261 S.W.3d 711, 715 (Mo. Ct. App. 2008) (explaining that courts may look beyond the label placed on a claim to ascertain the claims true nature). Indeed, one of Ashley's own arguments is that D&G cannot maintain an equitable estoppel claim because its arguments "pertain to future events, and not existing or past events." (Doc. 40 at 10.)

Construing D&G's claim as asserting promissory estoppel, D&G must prove four elements: "(1) a promise; (2) on which a party relies to his or her detriment; (3) in a way the promisor expected or should have expected; and (4) resulting in an injustice that only enforcement of the promise could cure." *Clevenger v. Oliver Ins. Agency, Inc.*, 237 S.W.3d 588, 590 (Mo. 2007) (citing *Zipper v. Health Midwest*, 978 S.W.2d 398, 411 (Mo. App. 1998)).

That said, Ashley's dismissal argument is also applicable as against a promissory-estoppel claim: It argues that a written agreement with an integration clause, such as the MIPA, undermines any assertion that D&G reasonably relied on external representation. (Doc. 40 at 9-

16

10.) Said differently, when there is a written contract that is expressly agreed upon as the totality of the obligations between the parties, reliance on representations that were not included in that written contract can never be reasonable as such. Ashley argues that D&G is bound by the express terms of the MIPA. (*Id.* at 10.)

D&G's response is the same as before: neither D&G nor Ashley is a party to the MIPA and therefore its terms have no effect on their mutual obligations. (Doc. 49 at 6.) Instead, it repeats its argument that the obligation arises from the Fee Agreement.

Once again, the Court finds that, at this early stage, the facts, taken in the light most favorable to D&G, are sufficient to support a facially plausible claim for promissory estoppel. The emails illustrate "an expression of intention by [Miller] to bring about a specified result in the future." *Kearney Commercial Bank v. Popejoy*, 119 S.W.3d 143, 147 (Mo. Ct. App. 2003). D&G's reliance on that expression apparently injured them. Whether the existence of the MIPA makes that reliance unreasonable is not an appropriate question at this point in the case. Accordingly, the Court will not dismiss Count II.

## Count III: Breach of Contract – Becker and SLEC vs. PI

In Count III, Becker and SLEC allege that PI breached its obligations under the MIPA by paying Miller and Miller Wells, failing to split money accrued by Ashley, failing to deliver financial statements, failing to fully release Becker's loan from PI, failing to fully pay the agreed-upon list of vendors, failing to pay D&G, and filing the Kentucky Action. (Doc. 25-1 at ¶ 77.) In addition, Becker and SLEC accuse PI of repudiating those and other obligations and allege anticipatory breach. (*Id.* at ¶ 79.)

PI argues that Becker and SLEC's claim fails as a matter of law because they did not plead facts illustrating PI's "unequivocal intent not to perform," which PI argues is an essential

17

element to an anticipatory-breach claim. (Doc. 40 at 14.) Furthermore, PI argues that Plaintiffs cannot proceed on an anticipatory-breach claim while simultaneously insisting that PI must perform under the MIPA. (*Id.* at 14-15.) PI asserts that Plaintiffs have not accepted the purported repudiation and therefore cannot claim anticipatory breach. (*Id.*)

Becker and SLEC respond that a breach may be inferred from a party's course of conduct and that PI's conduct is sufficient to support this inference—or, at the very least, a fact question exists as to the sufficiency. (Doc. 49 at 8-10.) In addition, they argue that Missouri law does not view the pursuit of legal action to enforce contractual rights as incompatible with a claim of anticipatory breach. (*Id.*)

Missouri has long recognized the doctrine of anticipatory breach by repudiation. *Carmel v. Dieckmann*, 617 S.W.2d 459, 460 (Mo. Ct. App. 1981) (citing *Ewing v. Miller*, 335 S.W.2d 154, 158 (Mo. 1960)). "A party to a contract repudiates that contract by manifesting, by words or conduct, a 'positive intention not to perform.'" *Id.* (quoting *Gateway Aviation, Inc. v. Cessna Aircraft Co.*, 577 S.W.2d 860, 862 (Mo. App. 1978). However, "[t]he party injured by an anticipatory breach has an election to accept or reject the refusal of performance." *Jetz Serv. Co. v. Botros*, 91 S.W.3d 157, 163 (Mo. Ct. App. 2002) (quoting 17B C.J.S. *Contracts* § 538, pp. 202-03 (1999)). "[T]he effect of an anticipatory repudiation is not nullified by the fact that the nonrepudiating party attempts to enforce performance," but "[i]f the promisee declines to accept the renunciation and continues to insist on the performance of the promise, as he or she may do, the contract remains in existence for the benefit, and at the risk, of both parties, and is binding on them." *Id.* (quoting 17B C.J.S. *Contracts* § 538, pp. 202-03).

The Court first notes that Plaintiffs' argument appears to be that Defendants' actual breach of the contract—for instance, allegedly failing to pay certain amounts at closing—demonstrates a future positive intention not to perform other obligations under the MIPA. In

18

other words, the Court understands Count III to advance two separate but related arguments: Defendants have failed to do a list of things they were supposed to have already done and this failure is strong evidence that Defendants do not plan to do the things they are supposed to do in the future. Further complicating matters is the fact that the list of alleged past breaches is nearly identical to the list of allegedly repudiated future obligations. (*Compare* Doc. 25-1 at ¶ 77 *with* Doc. 25-1 at ¶ 78.) As such, the Court construes the amended complaint as pleading outright breach and anticipatory breach as alternative claims for relief.

Whether PI has breached the MIPA is a legal question which cannot be answered at this stage and which requires significant factual discovery. Indeed, PI's dismissal argument focuses entirely on the anticipatory breach argument. (*See* Doc. 40 at 13-15.) However, viewing the facts before the Court in the light most favorable to Becker and SLEC, there is a facially plausible claim for breach and/or anticipatory breach of contract against PI based on PI's alleged conduct thus far. Accordingly, the Court will deny Defendants' motion to dismiss Count III.

## Count IV: Fraudulent Conveyance – All Plaintiffs vs. All Defendants

In Count IV, Plaintiffs allege that Defendants transferred some $479,970.00 from Ashley's operating account to Miller and Miller Wells. (Doc. 25-1 at ¶ 86.) Plaintiffs argue that those funds should have been paid to Plaintiffs under the terms of the MIPA and effectively drained Ashley's bank account, leaving it insolvent. (*Id.* at ¶¶ 85-95.) Plaintiffs argue that this was an illegal insider transfer designed to defraud them. (*Id.* at ¶ 94.)

Defendants argue that this claim should be dismissed for two reasons. First, they argue that Becker ratified Defendants' use of Ashley's operating funds when he initiated the complained-of wire transfers. (Doc. 40 at 16-17.) They note that he was the only person

19

authorized to access Ashley's bank account and therefore the transfer could not have occurred absent his understanding and consent. (*Id.*)

Under Missouri statute, transfers made by a debtor with the "intent to hinder, delay, or defraud any creditor" are avoidable. Mo. Rev. Code §§ 428.024, .039. However, Missouri courts have long recognized the concept of ratification—"the adoption or confirmation . . . of an unauthorized act"—"which converts an otherwise voidable contract into one which is valid and enforceable." *Turner v. Wesslak*, 453 S.W.3d 855, 859 (Mo. Ct. App. 2014) (citations omitted).

Plaintiffs respond that "[f]ull knowledge is an essential precondition for the application of estoppel" based on ratification. (Doc. 19 at 11 (citing *Murphy v. Jackson Nat. Life Ins. Co.*, 83 S.W.3d 663, 668 (Mo. Ct. App. 2002)).) They assert that ratification is an affirmative defense and that Defendants have failed to show that Becker knew that the wire transfer would eliminate any hope of future reimbursement. (*Id.*) In addition, they argue that D&G did not participate in the transfer and that therefore, at the very least, D&G's claim against Defendants should survive.

The Court finds that Becker's knowledge of the situation is relevant to the ratification inquiry and that the limited universe of facts before the Court at this time is insufficient to answer that inquiry. Accepting Plaintiffs' facts in the most favorable light, there is a facially plausible claim that Defendants directed Becker to transfer the bulk of Ashley's operating funds out of an account Becker controlled with the intent to hinder, delay, or defraud people or entities to which Ashley was indebted and that Becker did not know the effects of the transfer.

Defendants also argue that the amended complaint fails to plead fraud with the requisite level of particularity. (Doc. 40 at 15-18.) They assert that "[i]ntent to defraud must be shown by clear and convincing evidence," and argue that Plaintiffs' complaint is too vague to meet that standard. *Taylor v. Clark*, 140 S.W.3d 242, 251 (Mo. Ct. App. 2004) (citing *First Home Sav. Bank v. C & L Farms, Inc.*, 974 S.W.2d 621, 627 (Mo. Ct. App. 1998).

Plaintiffs assert that they "need not state each element of the fraud with particularity to satisfy this requirement" but must only "state enough so that his/her pleadings are not merely conclusory." *Thornton v. Pinnacle Foods Grp. LLC*, No. 4:16-CV-00158 JAR, 2016 WL 4073713, at \*4 (E.D. Mo. Aug. 1, 2016) (quoting *Roberts v. Francis*, 128 F.3d 647, 651 (8th Cir. 1997)). They note in their complaint that Ashley's payment to Miller was a transfer to an insider and that it represented substantially all of Ashley's assets, leading to Ashley's insolvency, and that all three actions are indications of intent listed in § 428.024.2. (Doc. 49 at 11-12.)

The Court finds that Plaintiffs' allegations are sufficient to survive dismissal. Their complaint identifies the "who, what, where, when, and how" of the alleged fraud: PI induced Becker to transfer funds from Ashley's account to Miller and his law firm via wire transfer on August 10, 2017. *See BJC Health Sys. v. Columbia Cas. Co.*, 478 F.3d 908, 917 (8th Cir. 2007). In addition, Plaintiffs set out their arguments for why the transfer was made in violation of the MIPA and how it damaged them. These allegations provide Defendants with sufficient factual material to respond, and they have done so. Accordingly, the Court will deny Defendants' motion to dismiss Count IV.

## Counts V and VI: Constructive Trust and Corporate Veil

In their final two claims, Plaintiffs seek court orders piercing Defendants' corporate veil, discovering assets, and placing those assets in a constructive trust from which to pay Plaintiffs what they are allegedly owed. (Doc. 25-1 at ¶¶ 96-106.) Defendants argue that both claims must fail because they rely on Plaintiffs' fraud claim. (Doc. 40 at 18-20.) Because the Court finds that Plaintiffs' fraud claim survives dismissal, it will deny Defendants' motion to dismiss these claims at this stage of the proceedings.

21

### *Motion to Sever*

D&G asserts that its claims should be severed in the event of dismissal or transfer because it is not a party to the Kentucky Action. (Doc. 62.) Defendants oppose that motion on the ground that their claims are too closely related to the other Plaintiffs' arguments to be spun off. (Doc. 67.)

The Court concludes that it need not address the issue because it has already found that dismissal and transfer are inappropriate. Because all of Plaintiffs' claims survive Defendants' motion, there is no reason to sever D&G's claims. The Court will therefore deny the motion without prejudice.

### *Motion for Leave to File Second Amended Complaint*

Finally, Plaintiffs move for leave to amend, seeking to add a number of additional claims based on three transactions they only recently uncovered, in part due to a Missouri Sunshine Law request. (Doc. 82.) They argue that Defendants had an affirmative duty under the MPA to notify Plaintiffs of all three transactions and that the failure to do represents additional breaches of that contract. (*Id.*) Defendants respond that Plaintiffs could have discovered the transactions long before and that they offer no explanation for why they waited this long to file a sunshine law request. (Doc. 85.)

The Court finds Defendants' argument unavailing. First, discovery in this case has not yet begun, due to the complicated procedural history of this case and the Kentucky Action. As discussed above, the Court believes that complexity is the result of Defendants' gamesmanship and will not punish Plaintiffs. Second, Defendants' assertion that Plaintiffs were dilatory in filing a public records request rings hollow in light of Plaintiffs' assertion that Defendants were obligated to notify Plaintiffs of each transaction as it occurred. Notably, Defendants do not dispute that assertion. In addition, the Court recognizes that allowing Plaintiffs to amend their

complaint will necessitate additional time to answer and, Defendants assert, the need for a new motion to dismiss. However, the Court also believes that its ruling on Defendants' current motion to dismiss resolves the bulk of any contemplated future motion. Ultimately, the Court finds good cause to allow Plaintiffs to amend and therefore will grant their motion.

## Conclusion

For the reasons discussed above, the Court concludes that dismissal is inappropriate. Defendants have failed to show either that the first-filed doctrine or compulsory-counterclaim rule compel the dismissal of this action or that any of Plaintiffs' claims are not facially plausible. Likewise, Defendants arguments in support of transfer are unavailing. D&G's alternative motion to sever is moot because the case will proceed in this Court.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiffs' Motion to Take Judicial Notice (Doc. 61), is **GRANTED.**

**IT IS FURTHER ORDERED** that Defendants' Motion to Dismiss (Doc. 39), is **DENIED.**

**IT IS FURTHER ORDERED** that Plaintiff Davis & Garvin, LLC's Motion to Sever (Doc. 62), is **DENIED without prejudice**.

**IT IS FINALLY ORDERED** that Plaintiffs' Motion for Leave to File a Second Amended Complaint (Doc. 82), is **GRANTED.**

Dated this 26th day of December, 2019.

JOHN A. ROSS
UNITED STATES DISTRICT JUDGE