UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| SL EC, LLC, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 4:18-CV-01377-JAR |
| | ) | |
| ASHLEY ENERGY, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM AND ORDER**

This matter is before the Court on Defendants' Motion for Partial Summary Judgment. (Doc. 129). The motion is fully briefed and ready for disposition. For the following reasons, the motion will be denied.

**I.    BACKGROUND**

In their haste to execute complex financial transactions over a late summer weekend, the parties to this dispute glossed over peripheral matters, like who, if anyone, would be responsible for hundreds of thousands of dollars in outstanding attorneys' fees. Those fees are at issue on this motion for partial summary judgment. A detailed review of the circumstances underlying this case is necessary given the fact-intensive issues raised by the instant motion.

This case concerns a historic steam power plant located in downtown St. Louis (the "Plant"). Until August 2017, the Plant was owned by Trigen-St. Louis Energy Corporation ("Trigen"), and the City of St. Louis held an assignable right to purchase the Plant. (Doc. 139 at ¶¶ 1-2). The city assigned this right to Plaintiff SL EC, LLC ("SLEC"), a company solely owned and controlled by Plaintiff Michael Becker ("Becker"). (*Id.* at ¶ 2). In May 2016, after realizing

SLEC lacked sufficient funds to purchase the Plant outright, Becker approached Defendant

Mason Miller ("Miller"), a member of Defendant Power Investments, LLC ("Power

Investments") and partner at Defendant Miller Wells, PLLC ("Miller Wells"). Becker proposed

to Miller that Power Investments and others provide funding in exchange for equity in the Plant.

(*Id.* at ¶¶ 14-16).

In October 2016, SLEC executed an agreement (the "Client Agreement") engaging

Plaintiff Davis & Garvin, LLC ("D&G") and Bick & Kistner, PC ("B&K") to provide legal

counsel regarding the "negotiation, acquisition, and closing of the purchase of the [Plant]." (Doc.

90-1 at 1-2). On November 23, 2016, SLEC created Defendant Ashley Energy, LLC ("Ashley

Energy"), the vehicle which would ultimately be used to purchase the Plant. (Doc. 139 at ¶ 5).

Becker and SLEC's plans quickly deteriorated. Throughout 2017, the parties worked to

arrange financing for the purchase of the Plant. (Doc. 131-1 at  70-106). On May 15, 2017,

Ashley Energy executed an Asset Purchase Agreement with Trigen to purchase the Plant. On

August 3, 2017, however, Jim Davis ("Davis") of D&G informed Miller that SLEC could not

afford to retain any ownership in Ashley Energy. (*Id.* at 59). Over the following few days, the

parties negotiated and executed a Membership Interest Purchase Agreement ("MIPA") and

Assignment and Assumption of Membership Interests Agreement ("Assignment Agreement").

Pursuant to these agreements, SLEC sold its entire membership interest in Ashley Energy to

Power Investments for a total purchase price of approximately $1.7 million.

The communications relating to the execution of these agreements are integral to the

current dispute. After being informed that SLEC would not retain any ownership in Ashley

Energy, Miller promptly responded that Ashley Energy "intends to proceed in the transaction

without . . . SLEC." (Doc. 131-1 at 59). The next day, Davis e-mailed Miller a rough summary of

2

the proposed transaction between SLEC and Power Investments. (Doc. 90-1 at 4). The following

morning, Miller responded with a draft agreement reflecting these terms and noted that he

"need[ed] to get this done today," presumably to shore up the financing arrangements. (*Id.* at 5).

Davis responded that very morning with six comments on the draft agreements, including the

following critical language:

> Related to the above, I have explained that as a result of John and [Becker's]
> behavior, I am not sure how I get paid for any of the work I've done over the last
> year or so. I realize that isn't your fault and if the deal doesn't close, it won't
> matter. Notwithstanding, if I am going to continue to work towards a resolution,
> I'm not interested in doing it for free. There are 2 opportunities: get paid at
> closing from the budgeted closing costs; and/or from Ashley Energy. [Becker]
> doesn't intend to work for Ashley [Energy]. That creates an opportunity to assist
> with the transition and get paid over time. (*Id.* at 6).

Still on the morning of August 5, 2017, Miller provided responses to Davis' comments,

including the following regarding Davis' desire to get paid:

> Two ways I can assist: 1. If there's any room in the closing costs for any of us, I'll
> stick you and my firm on there pro rata for whatever we can get. 2. I'm going to
> need local help, with the city, etc. Assuming [Becker] signs, consider yourself
> hired (there won't be a conflict at that point, in fact, it's probably in [Becker's]
> interest). (*Id.* at 9).

That evening, Davis e-mailed signature pages to the MIPA while noting that "some areas

require further refinement but, due to time limitations, will have to be addressed as time and

priorities permit." (*Id.* at 10). Davis' e-mail identified 13 matters requiring subsequent

clarification, including:

> 6. We have discussed the vendors who are entitled to payment from Ashley
> [Energy] or SLEC in connection with the closing of the sale. We can attach an
> exhibit which lists the vendors and amounts. [Power Investments] has agreed to
> assume these obligations of Ashley [Energy] as part of the membership purchase.
> These include the City of St. Louis; SWMDC; Veolia/Trigen; Power Investments,
> LLC; Mason Miller / Miller Wells; Husch Blackwell; Steve Hutchison; Arena;
> Wyndham / Paul Sugarman; Sam Francis; Planit; Dan Dennis; Burns &
> McDonnell; ADP; Acumen; and EDF.

> 8. We agreed that legal fees for [D&G] and Miller Wells would be paid at closing depending on the amount of available funds. (*Id.*).

Davis noted that the signature pages were being provided "with the condition that the above [13 comments] accurately reflects our agreement and that these additions and/or changes will be made to the final draft of the [MIPA]." (*Id.*). Miller quickly responded: "These all seem acceptable. Thanks for getting this done." (*Id.* at 12).

Davis followed up again the next day, August 6th, asking Miller to "confirm [his] agreement to the additional terms/revisions as set forth in the email yesterday." Davis asked if any items required further discussion since otherwise he would "assume we have an agreement on terms." (*Id.* at 14). Miller responded within a few hours: "Agreed and confirmed." (*Id.* at 15). On Tuesday, August 8th, Davis sent Miller a revised version of the MIPA purportedly incorporating the agreed upon changes. (*Id.* at 24). Miller requested a few minor changes but otherwise stated he could obtain the necessary signatures. (*Id.* at 25). The final MIPA and Assignment Agreement were sent to Miller later that day.

Less than a month later, after Ashley Energy closed on its acquisition of the Plant, Davis reached out to Miller to see "where things stand regarding . . . my invoice." (*Id.* at 33). Miller responded as follows:

> Finally, as far as payment of . . . your invoice, as I've mentioned, we have to get into our winter cash flow positive months to start chopping at those. As soon as we turn that corner, we'll be able to pay those down. Alternatively, if we get some cash in from other sources – perhaps financing – we might be able to make progress earlier. (*Id.*).

After this exchange, the communications between Davis and Miller transitioned from collegial e-mails to formal, pre-litigation letters. On September 13, 2017, Davis sent a letter to Miller requesting "immediate payment of my invoice for legal fees related to the acquisition of the [Plant]" and threatening litigation if payment was not received. (*Id.* at 36). This case soon

4

followed. Defendants now seek summary judgment on Counts I, II, III(b),[1] IV, and V of Plaintiffs' Second Amended Complaint.

## II.    LEGAL STANDARD

Under Fed. R. Civ. P. 56, a movant is entitled to summary judgment if they can "show that there is no genuine dispute as to any material fact" and they are "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether summary judgment is appropriate, the evidence must be viewed in the light most favorable to the nonmoving party. *Osborn v. E.F. Hutton & Co., Inc.*, 853 F.2d 616, 619 (8th Cir. 1988). The burden of proof is on the moving party and a court should not grant a summary judgment motion unless it is convinced that there is no evidence to sustain a recovery under any circumstances. *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc.*, 838 F.2d 268, 273 (8th Cir. 1988). The nonmovant, however, "'must do more than simply show that there is some metaphysical doubt as to the material facts,' and must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*, 475 U.S. 574, 587-87 (1986)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

## III.    ANALYSIS

<u>Count I – Breach of Contract</u>

In Count I of Plaintiffs' Second Amended Complaint, D&G claims that Ashley Energy breached its contractual obligation to pay legal fees in the amount of $156,263.50 plus interest and other costs. (Doc. 90 at ¶¶ 54-61). Under Missouri law, the elements to recover for breach of contract are "(1) the existence of an enforceable contract between [the parties to the action], (2)

---

[1] Plaintiffs' Second Amended Complaint labels two distinct counts as Count III. As the parties did in their briefing, this Court will refer to the first duplicative Count III as Count III(a) and the second as Count III(b).

that mutual obligations had arisen under its terms, (3) that [the party or parties being sued] had not performed obligations imposed by the contract and (4) that [the party seeking recovery] was thereby damaged." *Superior Ins. Co. v. Universal Underwriters Ins. Co.*, 62 S.W.3d 110, 118 (Mo.App. 2001) (quoting *Trimble v. Pracna*, 51 S.W.3d 481, 506 (Mo.App. 2001)). The key issue on this motion for partial summary judgment is whether there exists an enforceable contract making Ashley Energy liable for D&G's legal fees. D&G proposes multiple, arguably conflicting theories of contractual liability.

### *D&G and Ashley Energy's Alleged Oral Modification to Client Agreement*

As discussed above, D&G executed a written Client Agreement to represent SLEC in connection with the negotiation, acquisition, and closing of the purchase of the Plant. (Doc. 90-1 at 1-2). In his sworn affidavit, Becker claims that "[o]n or about November 23, 2016, SLEC, Ashley [Energy] and [D&G and B&K] modified the Client Agreement to state that any fees, interest, charges and expenses due under the Client Agreement would be paid by Ashley [Energy]." (Doc. 139-2 at ¶ 15). Davis' affidavit contains a virtually identical statement. (Doc. 139-1 at ¶ 20). D&G has clarified that this modification to the Client Agreement was performed orally, and there is no documentation reflecting the oral modification. (Doc. 139 at ¶¶ 8-9). Therefore, according to D&G, Ashley Energy is responsible for D&G's legal fees pursuant to the enforceable, orally modified Client Agreement.

Oral contracts are enforceable under Missouri law. *Clark v. Cordry*, 69 Mo.App. 6 (1897).[2] A jury, moreover, is entitled to believe the evidence testified to by [a party]," including "that an

---

[2] The statute of frauds does not apply because the Client Agreement could have been performed within one year. "[A] contract is not unenforceable under the statute of frauds if it could possibly be performed in compliance with its terms within one year, even though the actual performance is expected to continue over a much longer period." *Crabb v. Mid-Am. Dairymen, Inc.*, 735 S.W.2d 714, 716 (Mo. banc 1987). Because D&G has not established a genuine issue of material fact as to whether obligations under the Client Agreement were assigned to Ashley

oral agreement was reached amongst the parties." *Thomas D. Wilson Consulting, Inc. v. Keely & Sons, Inc.*, No. 4:05-CV-02115-ERW, 2007 WL 1774434, at \*7 (E.D. Mo. June 18, 2007). Though the existence of an oral contract is a question of fact, "judgment as a matter of law is appropriate if a party has not offered sufficient evidence to support the existence of a contract." *Schaller Telephone Co. v. Golden Sky Systems, Inc.*, 298 F.3d 736, 743-44 (8th Cir. 2002) (applying Iowa law). D&G has offered two sworn affidavits alleging the existence of an oral contract, which would typically be sufficient to create a genuine issue of material fact. *See Larsen v. Erickson*, 549 F.2d 1136, 1138 (8th Cir. 1977) (applying Minnesota law) (Affidavits "created a genuine issue of material fact in regard to the existence of the [ ] oral contract.").

As Defendants note, however, Plaintiffs have made various statements in their Second Amended Complaint and in the record which belie the existence of an oral agreement. The Second Amended Complaint states that "SLEC instructed D&G to use Ashley [Energy] as the buyer for the [Plant] and to represent [Ashley] as part of the purchase" and that the "representation of Ashley [Energy] by D&G was expressly authorized by SLEC and [Becker] and by the [Client Agreement] as a 'matter related' to purchase of the [Plant]." (Doc. 90 at ¶¶ 12, 14). In Count I itself, Plaintiffs contend that Power Investments "expressly agree[d] to assume the obligations and liabilities *of SLEC*, *including amounts due to D&G under the [Client Agreement]*," pursuant to the MIPA. (*Id.* at ¶ 56 (emphasis added)). This statement directly contradicts D&G's assertion that Ashley Energy was responsible for all fees under the orally modified Client Agreement. Indeed, the complaint contains no explicit reference to any oral modification.

---

Energy, this Court need not address the parties' arguments regarding the applicability of the statute of frauds to the incurrence or assumption of debt.

As the MIPA was revised, Davis made various statements demonstrating his understanding that SLEC remained responsible for fees under the Client Agreement. Davis expressed concern about his ability to get paid for his work, stating:

> [A]s a result of . . . [Becker's] behavior, I am not sure how I get paid for any of the work I've done over the last year or so . . . . Notwithstanding, if I am going to continue to work towards a resolution, I'm not interested in doing it for free. There are two opportunities: get paid at closing from the budgeted closing costs; *and/or from Ashley Energy.* (Doc. 90-1 at 6 (emphasis added)).

This statement, particularly the suggestion that D&G may be paid from closing costs "and/or from Ashley Energy," simply does not make sense if Ashley Energy had already been assigned full responsibility for D&G's fees. Later in the negotiation, Davis stated that "legal fees for [D&G] and Miller Wells would be paid at closing depending on the amount of available funds." (*Id.* at 10). In this same e-mail, Davis "discussed the vendors who are entitled to payment from Ashley [Energy] and/or SLEC in connection with the closing of the sale." (*Id.*). Such vendors were ultimately included as Exhibit A to the MIPA and, critically, did not include D&G.

The statements in the Second Amended Complaint and by Davis during MIPA negotiations appear entirely inconsistent with the existence of an oral agreement under which Ashley Energy was on the hook for all of D&G's legal fees. Instead, the statements reflect the reality that SLEC was responsible for the legal fees, but D&G was attempting to find some means of compensation in light of SLEC's financial difficulties. In its Second Amended Complaint, Plaintiffs clearly states that amounts due to D&G under the Client Agreement were SLEC's obligation. (Doc. 90 at ¶ 56). "A party is bound by what it states in its pleading . . . . Although the rule smacks of legalism, judicial efficiency demands that a party not be allowed to controvert what it has already unequivocally told a court by the most formal and considered means possible." *Knudsen v. United States*, 254 F.3d 747, 752 (8th Cir. 2001) (internal quotation omitted). Since D&G is bound by the

statement that its fees were SLEC's obligation, there is no genuine issue for trial as to whether Ashley Energy agreed to accept responsibility for all fees pursuant to an orally modified Client Agreement.

### *Assumption of D&G's Fees Under the MIPA*

Plaintiffs' Second Amended Complaint claims that, as a condition of the transfer of the Ashley Energy membership interests from SLEC, Power Investments expressly agreed to accept and assume amounts due D&G under the Client Agreement. (Doc. 90 at ¶ 56). Section 1.G of the MIPA provides that as "part of the consideration paid to the SLEC parties for the sale of the Membership Interest, Ashley Energy does hereby agree to accept and assume responsibility for the payment of certain obligations and expenses incurred by the SLEC parties . . . set forth on the attached Exhibit A." (Doc. 133 at § 1.G). The attached Exhibit A, which had previously been discussed over e-mail between Davis and Miller (Doc. 90-1 at 10), does not include D&G. Given the express terms of the MIPA, there is no genuine issue of material fact from which a reasonable factfinder could conclude that D&G's legal fees became Ashley Energy's liability pursuant to the explicit terms of § 1.G of the MIPA.

### *Agreement to Pay Fees if Funds Remained Available at Closing*

D&G contends that "direct evidence exists that Ashley Energy agreed in writing to pay D&G" depending on the availability of funds at closing. (Doc. 138 at 2). D&G's arguments rests on the acknowledgment by Miller that "legal fees for [D&G] and Miller Wells would be paid at closing depending on the amount of available funds." (Doc. 90-1 at 10). Davis specifically followed up to confirm this item (among others), to which Miller responded: "Agreed and confirmed." (*Id.* at 14-15). This confirmation was consistent with Miller's previous statement that

"[i]f there's any room in the closing costs for any of us, I'll stick [D&G] and my firm on there pro rata for whatever we can get." (Doc. 90 at 9). As evidenced by § 1.G of the MIPA, assignment of certain liabilities to Ashley Energy, including amounts owed to creditors of SLEC, was a core element of the consideration paid to SLEC.

Ashley Energy argues that Miller had no authority to act on behalf of Ashley Energy at the time these e-mails were sent. Per the doctrine of privity, "a person cannot acquire rights or be subject to liabilities arising under a contract to which he is not a party." *Baisch & Skinner, Inc. v. Bair*, 507 S.W.3d 627, 632 (Mo.App. 2016). Therefore, Ashley Energy argues, it cannot be held liable for Miller's statements prior to execution of the MIPA and Assignment Agreement. "It is impossible for Mason Miller to have taken any action on behalf of Ashley [Energy] before he gained control of the entity." (Doc. 130 at 9).

At the outset, the Court notes that the law of privity is not as strictly construed in Missouri as Ashley Energy suggests. "The rule requiring privity has not been followed blindly and without exception . . . . [W]hen the application of the rule would produce a result contrary to the requirements of essential justice and sound public policy it has been whittled away by exceptions." *Westerhold v. Carroll*, 419 S.W.2d 73, 77 (Mo.App. 1967). The purpose of the doctrine of privity is to "shield contracting parties from unlimited liability and to prevent encumbering parties with duties not voluntarily assumed." *Baisch & Skinner, Inc.*, 507 S.W.3d at 632 (citing *Captive Lake Invs., LLC v. Ameristructure, Inc.*, 436 S.W.3d 619, 626 (Mo.App. 2014)). Missouri courts have frequently recognized exceptions to the doctrine of privity.[3]

---

[3] Missouri courts generally consider "(1) the extent to which the transaction was intended to affect the plaintiff; (2) the foreseeability of harm to him; (3) the degree of certainty that the plaintiff suffered injury; (4) the closeness of the connection between the defendant's conduct and the injury suffered; (5) the moral blame attached to defendant's conduct; and (6) the policy of preventing future harm." *Miller v. Big River Concrete, LLC*, 14 S.W.3d 129, 134 (Mo.App. 2000). The Court recognizes that such exceptions are often considered in the context of tort claims (typically negligent misrepresentation).

SLEC sold its membership interest in Ashley Energy to Power Investments. In negotiations, Miller (as representative for Power Investments) clearly agreed that D&G's legal fees would be paid out of closing funds if such funds were available. In his affidavit, Miller describes this exchange and acknowledges his agreement with Davis that "the law firms would be paid contingent upon whether there were any funds remaining from the budgeted closing costs." (Doc. 131-1 at ¶ 34). Defendants' own Statement of Uncontroverted Material Facts ("SUMF") admits the existence of a contingent agreement: "There was never an agreement that any fees would be paid, rather that both parties understood that the law firms would be paid contingent upon whether there were any funds remaining from the budgeted closing costs." (Doc. 131 at ¶ 29). Ashley Energy now claims that no such agreement existed.

The e-mails between Davis and Miller objectively establish the parties' intention that D&G's legal fees would be paid at closing contingent on funds being available (as opposed to those vendors in Exhibit A, who Ashley Energy was obligated to pay in full regardless of the availability of closing funds).[4] Ashley Energy's current position, that this agreement could not bind Ashley Energy because it was not yet owned by Power Investments, "ignores the legal, financial, and practical realities of business acquisitions." *Guller v. Waks*, 550 S.W.3d 505, 510 (Mo.App. 2017). For all intents and purposes, Ashley Energy voluntarily assumed a duty to pay

---

[4] When this issue previously arose on its motion to dismiss, Ashley Energy argued that the parol evidence rule barred consideration of Miller's e-mails, especially in light of the MIPA's integration clause. (Doc. 40 at 8-9). "In the absence of fraud, accident, mistake, or duress, the parol evidence rule prohibits evidence of prior or contemporaneous oral agreements which vary or contradict the terms of an unambiguous, final and complete writing." *Jake C. Byers, Inc. v. J.B.C. Investments*, 834 S.W.2d 806, 811 (Mo.App. 1992). Ashley Energy has not made this argument in its motion for summary judgment. If it had, this Court would consider whether there was accident or mutual mistake in failing to include D&G's legal fees in the supposedly final version of the MIPA. The Court would also consider whether the contingent payment of legal fees constituted an entirely separate agreement established via e-mail. Finally, in light of the numerous signed versions of the MIPA which were exchanged between the parties, a fact issue may exist as to whether Miller's e-mails and statements preceded execution. On September 6, 2017, well after the MIPA had been executed, Miller again acknowledged an obligation to "pay down" D&G's legal fees. (Doc. 90-1 at 33).

D&G's legal fees if funds remained available at closing. Holding Ashley Energy responsible for Miller's clear statements does not encumber Ashley Energy with a duty not voluntarily assumed; Ashley Energy's current owner explicitly assumed the duty in contemplation of the acquisition. This Court finds that under Missouri law, when an acquiror agrees that the purchased entity will accept certain liabilities of the seller as part of the contractual consideration, the purchased entity cannot rely on the doctrine of privity to disavow the acquiror's statements. Such an interpretation "avoid[s] absurd results." *Id.*

Ashley Energy next argues that even if such an agreement existed, there were no funds available at closing, and therefore Ashley Energy is not in breach of the agreement. According to Miller's affidavit before this Court, only $400,000 were allocated to closing, but costs exceeded $600,000. (Doc. 131-1 at ¶ 37). Miller also claims that Millers Wells still has not been compensated for $331,545.70 in legal fees. (*Id.* at ¶ 58).

Becker has responded by noting that he was directed by Miller just after executing the MIPA to wire $204,500 from Ashley Energy's bank account to Miller Wells for "Legal fees," as well as $264,490 to Miller himself for "personal reimbursement." (Doc. 139-2 at ¶ 22).[5] Miller explained to the bank that these transactions were "for closing costs associated with the acquisition." (*Id.* at 25). Defendants argue that none of these payments were in fact for Miller Wells' legal fees, and "[t]here was no money remaining after the transaction closed." (Doc. 130 at 10). It is apparent from the admitted portion of the SUMF that actual closing costs exceed allocated funds (Doc. 131 at ¶¶ 32-33). The wiring of $204,500 to Miller Wells for "Legal fees" creates a

---

[5] Ashley Energy has offered no explanation whatsoever why these funds were transferred to Miller Wells given the alleged purpose of the funds, according to Ashley Energy, was for a promissory note and fees owed to Miller and Power Investments. (Doc. 131 at ¶ 39). Ashley Energy has also failed to explain why the breakdown of the distributions (transfers of $204,500 and $264,490) differs from the breakdown of the alleged purpose of the transfers ($335,638.77 for repayment of the promissory note and $133,351.23 for fees).

genuine issue of material fact, however, as to whether D&G was due a pro rata portion of such fees. While it is a close question, particularly due to Plaintiffs' inadequate responses to Defendants' SUMF,[6] this disagreement as to whether funds were available to pay D&G's legal fees is a genuine dispute over material facts best left for the factfinder to resolve.

Accordingly, this Court denies Defendants' motion for partial summary judgment on Count I because a reasonable factfinder could conclude that (i) an agreement existed for Ashley Energy to pay D&G's legal fees if funds remained available after closing and (ii) such funds remained available after closing. D&G has not brought forward facts permitting a reasonable factfinder to conclude, however, that the Client Agreement was orally modified on November 23, 2016 to assign all liability for fees to Ashley Energy, or that the express terms of the MIPA or Assignment Agreement made such an assignment.

Count II – Promissory Estoppel[7]

D&G claims that it continued to provide legal services in furtherance of the Plant acquisition in reliance on Miller's statement that D&G would be paid if funds remained available at closing. Promissory estoppel has four elements under Missouri law: "(1) a promise; (2) on which

---

[6] The Court recognizes, as Defendants argue in their reply, that Plaintiffs' briefing suffered from certain procedural defects and that many of their repeated objections to Defendants' SUMF were meritless. (Doc. 146 at 3-6). The Court will not strike Plaintiffs' response or deem all facts admitted simply because the response was filed one day late.

The Court will, however, deem as admitted ¶¶ 28-51, 54, and 56-57 of Defendants' SUMF (except to the extent that they draw legal conclusions; *see, e.g.*, ¶ 29). Plaintiffs' responses simply allege that the facts are irrelevant to the suit. But this Court's reasoning clearly demonstrates that the availability of funds at closing is relevant to the disposition of Count I. Plaintiffs' responses to other claims in the SUMF and attached affidavits by Davis and Becker contain specific factual allegations challenging Defendants' claim that funds remained available. These claims are the basis on which this Court has determined there is a genuine issue of material fact as to whether funds remained available at closing.

[7] D&G's claim under Count II is labeled as Equitable Estoppel in the Second Amended Complaint. (Doc. 90-1 at 11). In its order on Defendants' motion to dismiss, this Court stated its belief that Count II is mislabeled and is more appropriately analyzed as a promissory estoppel claim. (Doc. 89 at 16). The parties appear to have accepted this recharacterization, so the Court will treat Count II as a promissory estoppel claim.

a party relies to his or her detriment; (3) in a way that the promisor expected or should have expected; and (4) resulting in an injustice that only enforcement of the promise could cure." *Clevenger v. Oliver Ins. Agency, Inc.*, 237 S.W.3d 588, 590 (Mo. 2007) (citing *Zipper v. Health Midwest*, 978 S.W.2d 398, 411 (Mo. App. 1998)). "Courts are to apply the doctrine of promissory estoppel 'with caution, sparingly and only in extreme cases to avoid unjust results.'" *Kearney Commercial Bank v. Popejoy*, 119 S.W.3d 143, 146-47 (Mo.App. 2003) (quoting *Midwest Energy, Inc. v. Orion Food Sys., Inc.*, 14 S.W.3d 154, 165 (Mo.App. 2000)).

Ashley Energy argues, similar to its claims against Count I, that the promises made by Miller before execution of the MIPA were not made by Ashley Energy.[8] A claim of promissory estoppel requires that the plaintiff "allege a promise made by the defendant." *Jamison Elec. L.L.C. v. Dave Orf, Inc.*, 404 S.W.3d 896, 898 (Mo.App. 2013). For the same reasons discussed above regarding Count I, this Court will not grant summary judgment on the basis that Miller could not speak for Ashley Energy. Assignment of certain liabilities to Ashley Energy was a key consideration, as evidenced by § 1.G of the MIPA. Ashley Energy cannot disavow such liabilities on the grounds that its current owner made the statements prior to final execution of the MIPA.

The "elements of promissory estoppel are fact dependent," and they "necessarily involve fact-finding and require inquiry into the circumstances surrounding the making of the promise." *Ruzicka v. Conde Nast Publ'ns, Inc.*, 999 F.2d 1319, 1322 (8th Cir. 1993) (applying Minnesota law); *see also Savannah Place, Ltd. v. Heidelberg*, 122 S.W.3d 74, 81 (Mo.App. 2003) ("It has

---

[8] The Court notes Defendants' argument that D&G has waived this claim by failing to specifically respond to the facts and arguments outlined in Count II. (Doc. 146 at 8-9). "[F]ailure to oppose a basis for summary judgment constitutes waiver of that argument." *Satcher v. Univ. of Arkansas at Pine Bluff Bd. of Trustees*, 558 F.3d 731, 735 (8th Cir. 2009). While the Court recognizes that D&G's response to the summary judgment motion is not a model of clarity, D&G did directly respond to Defendants' arguments on Count II. In their own memorandum in support of the motion for partial summary judgment, Defendants' arguments as to Count II are tucked within its analysis of Count I. (Doc. 130 at 9-10). This was entirely appropriate as the issues are interrelated. D&G's brief response substantively addresses Defendants' claim as to Count II, and therefore the claim has not been abandoned.

14

been broadly held that estoppel . . . is a question of fact.") (internal quotation omitted). A reasonable factfinder could conclude that Ashley Energy, through Miller, promised that D&G would be paid legal fees contingent on funds being available at closing and divided pro rata with Miller Wells. The factfinder could further conclude that D&G appropriately relied on this promise and continued to provide legal services with the expectation of potentially receiving its fees, and that only enforcement of the promise can cure the resulting injustice.

<u>Count III(b), IV, and V – Fraudulent Conveyance, Discovery of Assets/Establishment of Constructive Trust, and Piercing of Corporate Veil</u>[9]

Plaintiffs claim that the cash transfers from Ashley Energy to Miller and Miller Wells were fraudulent conveyances and therefore voidable under Mo. Rev. Stat. § 428.039. Defendants argue that D&G was not a creditor of Ashley Energy at the time of the transfers and Becker himself executed and thereby ratified the transfers. Plaintiffs respond that Becker "had no idea whatsoever that his wire transfer of Ashley [Energy] funds would possibly preclude him from recovering from Defendants." (Doc. 138 at 3).

"The key elements of a fraudulent conveyance are the conveyance of goods or titles with an intent to hinder, delay, or defraud creditors." *Taylor v. Clark*, 140 S.W.3d 242, 251 (Mo.App. 2004) (quoting *Bueneman v. Zykan*, 52 S.W.3d 49, 54 (Mo.App. 2001)); *see* Mo. Rev. Stat. § 428.024. Under Missouri law, a creditor is a person who has a claim, and a claim is broadly defined as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, *contingent*, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." Mo. Rev. Stat. § 428.009(3)-(4) (emphasis added). This definition has been interpreted

---

[9] As this Court has previously suggested, Counts IV and V seek remedies based on Defendants' alleged fraudulent conveyance. Accordingly, all three counts can be considered jointly, and will stand or fall based on the disposition of the fraudulent conveyance claim.

broadly. *See Curtis v. James*, 459 S.W.3d 471, 475-76 (Mo.App. 2015). Based on this Court's reasoning as to Count I above, there is clearly a genuine issue of material fact as to whether D&G was a contingent creditor of Ashley Energy at the time of the cash transfers.

Defendants also argue that Becker ratified the transfers. At the outset, the Court notes that Becker could not have ratified the transfers on behalf of D&G. Therefore, since D&G was a potential creditor of Ashley Energy and Defendants do not allege that D&G ratified the transfers, summary judgment will be denied on Counts III(b), IV, and V as to D&G's claim of fraudulent conveyance.

As Defendants suggest, there is minimal precedent in Missouri applying the concept of ratification to fraudulent conveyances, but cases preceding adoption of the Missouri Uniform Fraudulent Transfer Act ("MUFTA") recognize the principle. *See Red Top Gas, Inc. v. Dale Hensley & Fred Hawkins*, 441 S.W.2d 325 (Mo. 1969); *Milan Bank v. Richmond*, 217 S.W. 74 (Mo. 1919). Mo. Rev. Stat. § 428.054 specifically provides that the "law relating to . . . estoppel" supplements the provisions of MUFTA. Missouri courts have interpreted § 428.054 as "incorporat[ing] the pre-existing legal and equitable principles related to the law of fraudulent conveyance insofar as those principles do not conflict with the provisions of the [Uniform Fraudulent Transfer Act]." *Volk Const. Co. v. Wilmescherr Drusch Roofing Co.*, 58 S.W.3d 897, 900 (Mo.App. 2001). The parties all appear to recognize, as does this Court, the general principle that a creditor who knowingly authorized or sanctioned a transaction cannot then claim to have been defrauded by the transaction under Missouri law. This finding is consistent with other courts' interpretations of the Uniform Fraudulent Transfer Act. *See, e.g.*, *In re Adelphia Recovery Trust*, 634 F.3d 678, 691 (2d Cir. 2011) ("A fraudulent transfer is not void, but voidable; thus, it can be

ratified by a creditor who is then estopped from seeking its avoidance.") (quoting *In re Best Prods. Co.*, 168 B.R. 35, 57 (Bankr.S.D.N.Y. 1994)).

Ratification "converts an otherwise voidable contract into one which is valid and enforceable." *Turner v. Wesslak*, 453 S.W.3d 855, 859 (Mo.App. 2014) (citing *Murphy v. Jackson Nat'l Life Ins. Co.*, 83 S.W.3d 663, 668 (Mo.App. 2002)). "Knowledge is an essential element of ratification." *Murphy*, 83 S.W.3d at 668. Defendants argue, and the SUMF establishes, that SLEC and Becker owed $479,970 to Power Investments and Miller for repayment of a promissory note ($335,638.77), fees due to Power Investments ($133,251.23), and reimbursement to Miller for payments on the Plant's natural gas bill ($10,980), and that Becker was aware of these debts. (Doc. 131 at ¶ 39). Such arguments are supported by the admitted portions of Defendants' SUMF.

Becker claims that he was simply following orders to distribute funds from Ashley Energy's bank account pursuant to his obligations under the MIPA. (Doc. 139-2 at ¶¶ 19-25). As Becker notes, the MIPA specifically provides that Becker and SLEC would "execut[e] documents, agreements, and other instruments and writings in the name of Ashley [Energy] . . . as may be required . . . and by otherwise acting as PI and Ashley Energy's agent-in-fact." (Doc. 133 at § 3). The MIPA further stated that "neither SLEC nor [ ] Becker shall have any duty to confirm the accuracy, completeness or truthfulness of said documents and agreements. [Power Investments] shall be *solely responsible for the content, effect and consequences* related to such documents and agreements." *Id.* (emphasis added).

Becker appears to have been acting as an agent and under the direction of Ashley Energy and Power Investments when he signed off on the cash transfers. It is simply a bridge too far to state that Becker's fulfillment of his contractual obligation constituted knowing ratification of transfers he now alleges were fraudulent. The cash transfers may not have been inherently

fraudulent, but instead only fraudulent to the extent that Ashley Energy intended to prevent Becker, SLEC, and D&G from subsequent recovery and potentially violate § 5.A of the MIPA. Ratification requires knowledge of "all material matters." *Fed. Enters., Inc. v. Greyhound Leasing & Fin. Corp.*, 849 F.2d 1059, 1062 n.5 (8th Cir. 1988) (quoting *Hyken v. Travelers Ins. Co.*, 678 S.W.2d 454, 459 (Mo.App. 1984)). Despite the evidence indicating Becker's understanding of the purpose of the transfers, this Court declines to find that Becker knowingly ratified the transfers where the MIPA expressly absolves Becker of any obligation to confirm the accuracy, completeness, or truthfulness of the documents. Despite Plaintiffs' apparent suggestion, this decision does not imply that a party must fully understand the legal consequences of their actions in order to establish ratification.

Missouri courts have recognized that ratification is a question of fact. "[I]f there is any dispute as to the facts or if different inferences can reasonably be drawn, ratification is a question of fact to be determined by the trier of the fact and not by the court." *Weisz v. Great Am. Title Q 1-103-1, LLC*, 603 S.W.3d 336, 344 (Mo.App. 2020) (quoting *Epps v. Epps*, 438 S.W.3d 422, 424-25 (Mo.App. 2014)).[10] Because there is a genuine dispute of material fact as to whether Becker ratified the cash transfers, summary judgment will be denied on Counts III(b), IV, and V.

## IV.    CONCLUSION

In determining whether summary judgment is appropriate, this Court must view the evidence in the light most favorable to the nonmoving party. *Osborn v. E.F. Hutton & Co., Inc.*, 853 F.2d 616, 619 (8th Cir. 1988). Summary judgment is not warranted in this fact-intensive case

---

[10] The Court notes that many of the cases cited here, as well as those cited by the parties, concern ratification on issues relating to contracts and under general agency law as opposed to fraudulent conveyances specifically. These courts' assessments of the knowledge requirement for ratification logically extend to the knowledge requirement for ratification of fraudulent transfers. Especially considering the scant precedent regarding ratification of fraudulent transfers, reliance on these precedents is appropriate.

given the many issues of material fact which remain subject to genuine dispute. On Count I, viewing the evidence in the light most favorable to Plaintiffs, there is a genuine issue of material fact as to the existence of a contingent agreement to pay legal fees and whether funds remained available at closing. On Count II, a reasonable factfinder could conclude that D&G reasonably relied on Ashley Energy's promise to pay legal fees if funds remained available at closing. Finally. on Counts III(b), IV, and V, Defendants have not demonstrated that Becker necessarily had knowledge of all material facts and therefore ratified the transfer.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Partial Summary Judgment (Doc. 129) is **DENIED.**

Dated this 7th day of December, 2020.

_John A. Ross_
JOHN A. ROSS
UNITED STATES DISTRICT JUDGE