## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

SL EC, LLC, et al.,                                   )
                                                      )
         Plaintiffs,                        )
                                                      )
         v.                                 )          Case No. 4:18-CV-01377-JAR
                                                      )
ASHLEY ENERGY, LLC, et al.,                           )
                                                      )
         Defendants.                        )

## MEMORANDUM AND ORDER

This matter is before the Court on Defendants' Motion for Summary Judgment. (Doc. 201). The motion is fully briefed and ready for disposition.[1] For the reasons discussed below, the motion will be granted in part and denied in part.

## I.    BACKGROUND[2]

This case concerns the purchase of a historic steam power plant in downtown St. Louis (the "Plant"). The City of St. Louis assigned its right to purchase the Plant to Plaintiff SL EC, LLC ("SLEC"), a company solely owned and controlled by Plaintiff Michael Becker ("Becker"). SLEC created a wholly-owned subsidiary in Defendant Ashley Energy, LLC ("Ashley Energy") to purchase the Plant. Pursuant to a client agreement (the "Client Agreement"), SLEC retained Jim Davis ("Davis") of Plaintiff Davis & Garvin, LLC ("D&G") to represent them in the Plant transaction.

---

[1] In reply, Defendants argue that this Court should strike Plaintiffs' response for being tardy. (Doc. 209 at 1-2). Plaintiffs' response was due on July 22, 2021 (Doc. 185) but not filed until the early morning hours of July 23, 2021. While the Court reminds Plaintiffs of their obligation to strictly comply with deadlines, it will exercise its discretion and decline to strike Plaintiffs' response.

[2] Unless otherwise noted, all facts included in this section are admitted per Plaintiffs' Response to Defendants' Statement of Material Facts ("SMF"). (Doc. 207).

SLEC could not afford to purchase the Plant by itself but intended to participate in the acquisition. Accordingly, in May 2016, Becker approached Defendant Mason Miller ("Miller"), the managing member of Defendant Power Investments, LLC ("Power Investments") and a partner at Defendant Miller Wells, PLLC, a law firm ("Miller Wells"). Initially, the parties expected that Power Investments and others would fund Ashley Energy's purchase of the Plant in exchange for some portion of the equity in Ashley Energy.

These plans deteriorated when SLEC and Becker encountered substantial financial difficulty and even contemplated bankruptcy. On August 3, 2017, Davis informed Miller that SLEC could not afford to retain any ownership in Ashley Energy. (Doc. 203-1). Instead, the parties agreed that Power Investments would purchase Ashley Energy outright. The parties had already coordinated financing of approximately $8,500,000 from Arena Investors, L.P. (the "Arena Financing"), who is not a party to this litigation, to fund the acquisition. Over the following few days, the parties hastily drafted and executed a Membership Interest Purchase Agreement ("MIPA") and Assignment and Assumption of Membership Interests Agreement ("Assignment Agreement"). The undisputed portions of the MIPA provide that Power Investments would purchase 100% of the equity in Ashley Energy in exchange for (i) $600,000 up front[3] and (ii) a contingent $1,100,000 payment (the "Contingent Payment"). The status of the Contingent Payment is the key issue in this litigation.

Plaintiffs' sprawling Second Amended Complaint ("SAC") (Doc. 90) includes the following counts:

---

[3] The Court recognizes that the $600,000 up front payment actually consisted of three separate payments of $65,000 at time of closing, cancellation of a $335,000 loan at time of closing, and an additional $200,000 thirty days thereafter. (Doc. 133 at §§ 1.A, 1.B, 1.C).

**Counts I and II – D&G's <u>Breach of Contract</u> and <u>Promissory Estoppel</u> Claims Against Ashley Energy**: D&G alleges that Defendants have failed to pay legal fees incurred in the Plant transaction.[4]

**Count III(a)[5] – Becker and SLEC's <u>Breach of Contract</u> Claim Against Power Investments**: Becker and SLEC allege that Power Investments has breached various provisions in the MIPA.

**Count III(b) – Plaintiffs' <u>Fraudulent Conveyance</u> Claim Against Defendants**: Plaintiffs allege that Defendants fraudulently conveyed approximately $479,970 from Ashley Energy to Miller and Miller Wells after closing.

**Counts IV and V – Plaintiffs' Claims for <u>Discovery of Assets, Establishment and Imposition of Constructive Trust, and to Pierce Corporate Veil</u>**: These counts seek remedies in connection with Plaintiffs' fraudulent conveyance claim in Count III(b). Because the Court will grant summary judgment in favor of Defendants on Count III(b), it will also dismiss these claims for associated remedies.

**Counts VI, VII – Becker and SLEC's <u>Breach of Contract</u> Claim Against Power Investments**: Becker and SLEC allege that Power Investments has breached the MIPA by failing to make the Contingent Payment.

**Count VIII – Becker and SLEC's <u>Constructive Trust</u> Claim Against Ashley Energy**: Becker and SLEC seek the remedy of imposition of a constructive trust in connection with their breach of contract claim. Because the Court will deny summary judgment as to certain of Becker and SLEC's breach of contract claims, it will also deny summary judgment as to this claim for an associated remedy.

**Count IX – Becker and SLEC's <u>Tortious Interference</u> Claim Against Defendants**: Becker and SLEC allege that Defendants tortiously interfered in relation to an application by Ashley Energy for Property Assessed Clean Energy ("PACE") financing.

**Count X – Becker and SLEC's <u>Breach of Mutual Release</u> Claim Against Power Investments**: Becker and SLEC allege that Power Investments breached the mutual release provision of the MIPA by pursuing litigation in Kentucky.

Defendants have filed counter-claims on related grounds (Doc. 115), and a jury trial is currently set for October 18, 2021. (Doc. 185).

---

[4] This Court has dismissed Counts I and II of the SAC with prejudice due to D&G's discovery misconduct. (Doc. 212). Accordingly, Defendants' motion for summary judgment will be denied as moot as to these counts.

[5] The SAC duplicates Count III. This Court and the parties have consistently referred to the breach of contract claim as Count III(a) and the fraudulent conveyance claim as Count III(b).

## II.     LEGAL STANDARD

Under Fed. R. Civ. P. 56, a movant is entitled to summary judgment if they can "show[] that there is no genuine dispute as to any material fact" and they are "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Meier v. City of St. Louis*, 934 F.3d 824, 827-278 (8th Cir. 2019). In determining whether summary judgment is appropriate, this Court views the evidence in the light most favorable to the nonmovant. *Osborn v. E.F. Hutton & Co.*, 853 F.2d 616, 619 (8th Cir. 1988). The nonmovant, however, "must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (internal quotations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

## III.     ANALYSIS

A.  <u>MIPA Claims</u> (Counts III(a), VI, VII, VIII, X)

In Counts III(a), VI, VII, and X, Plaintiffs allege that Defendants have breached various provisions of the MIPA, most importantly by failing to make the Contingent Payment. Unfortunately, despite multiple lawyers' involvement in its negotiation, the parties disagree over which document constitutes the final version of the MIPA. The versions proposed by each side include material, potentially dispositive differences regarding the Contingent Payment and other matters. Thus, the Court must sift through a seemingly frantic summer weekend of e-mails and phone calls between the parties to determine, if possible, which document constitutes the official, executed version of the MIPA for purposes of this litigation.

*Identifying the True MIPA*

The negotiation of the MIPA included numerous e-mails and phone calls, sometimes just minutes apart and often lacking important details. A detailed timeline of these events is necessary to determine whether this Court can decide as a matter of law which document constitutes the agreed upon MIPA. Prior to August 5, 2017, the parties had exchanged term sheets and generally negotiated the Plant purchase.

- <u>E-mail from Miller to Davis on August 5, 2017 at 8:09 A.M.</u> (Doc. 207-2 at 5): On a Saturday morning, Miller e-mails Davis and attaches a draft MIPA "reflecting the terms of the general offer we've discussed." Miller explains that he "need[ed] to get this done today" and requests that Davis "please secure [Becker's] signature as quickly as possible." The attached MIPA includes the following language regarding the Contingent Payment in § 1.D:

  o "Upon the earlier of a transaction resulting in: (a) the sale, merger or liquidation of [Power Investments]; (b) the sale, merger or liquidation of Ashley [Energy]; or (c) the repayment or refinancing of the Arena Financing (an "Exit Event"), [Power Investments] shall pay the sum of $1,100,000 to SLEC (the "Final Payment"); provided, however, that as a result of such Exit Event should [Power Investments] receive total consideration less than $1,100,000, then the Final Payment shall be equal to 50% of the total consideration received by [Power Investments] as a result of the Exit Event." (*Id.* at 7) (hereinafter "Version #1").

- <u>Response from Davis to Miller on August 5, 2017 at 10:05 A.M.</u> (Doc. 203-1 at 130): Davis responds with six comments, including the risk that "[r]efinancing may not result in a cash out." Davis proposes to address this "by adding that [Power Investments] will make every effort to obtain cash out or that, in the event there is cash available, that it will be used to pay the SLEC obligation."

- <u>Response from Miller to Davis on August 5, 2017 at 10:18 A.M.</u> (*Id.* at 131): Miller responds to each of the six comments with "[q]uick notes" and mentions he "will call in a minute." As to the refinancing, Miller states that he "[a]gree[s] with the 'best efforts' approach" and mentions that if Power Investments "gets any distributions, [he will] apply 50% against the SLEC debt."

- <u>Revised Draft from Miller to Davis on August 5, 2017 at 10:38 A.M.</u> (Doc. 207-2 at 11): Miller sends Davis a revised MIPA supposedly "consistent with [his] notes" from the 10:18 A.M. e-mail. He states this version is the "best [he] can do" and requests that Davis "ask [Becker] to sign it . . . as soon as possible." The attached draft includes the following Contingent Payment provision, with changes from Version #1 bolded:

5

○ "Upon the earlier of a transaction resulting in: (a) the sale, merger or liquidation of [Power Investments]; (b) the sale, merger or liquidation of Ashley [Energy]; or (c) the repayment or refinancing of the Arena Financing (an "Exit Event"), [Power Investments] shall pay the sum of $1,100,000 to SLEC (the "Final Payment"); provided, however, that as a result of such Exit Event should [Power Investments] receive total consideration less than $1,100,000, then the Final Payment shall be equal to 50% of the total consideration received by [Power Investments] as a result of the Exit Event. **[Power Investments] shall use its best efforts to obtain an Exit Event that provides sufficient consideration to make the Final Payment. Should [Power Investments] receive any profit distributions from Ashley [Energy] prior to an Exit Event, 50% of any such distributions shall be paid to SLEC and applied as a pre-payment to the Final Payment**." (*Id.* at 15) (hereinafter "Version #2").

- <u>Response to Revised Draft from Davis to Miller on August 5, 2017 at 6:55 P.M.</u> (*Id.* at 19): Davis attaches the signature page for the revised MIPA "as evidence of our general agreement on the terms offered by Power Investments." But Davis notes that, as discussed, "there are still some areas that require further refinement, but due to the time limitations, will have to be addressed as time and priorities permit." Davis proceeds to identify 13 issues requiring further revision or action, though none specifically concern the disputed portions of the Contingent Payment provision. Davis ends the e-mail by carefully explaining that he is "delivering the signature pages with the condition that the above [13 issues] accurately reflects our agreement and that these additions and/or changes will be made to the final draft of the [MIPA]." (*Id.* at 20).

- <u>Response from Miller to Davis Regarding 13 Issues on August 5, 2017 at 7:14 P.M.</u> (*Id.* at 23): Miller's response states: "These all seem acceptable. Thanks for getting this done."

- <u>Follow-Up from Davis to Miller Confirming Agreement on August 6, 2017 at 10:49 A.M.</u> (*Id.* at 26): The following morning, at the behest of Becker, Davis e-mails Miller "to confirm [his] agreement to the additional terms/revisions as set forth in the email yesterday." Davis suggests they could "finalize the document when time permits," but unless any items required further discussion, he would "assume we have an agreement on terms."

- <u>Confirmation to Agreement on Terms from Miller to Davis on August 6, 2017 at 10:58 A.M.</u> (*Id.* at 27): Miller responds "[a]greed and confirmed," reflecting his confirmation of the MIPA incorporating Version #2 as well as the 13 issues set out in the e-mail sent by Davis at 6:55 P.M. on August 5, 2017.

- <u>New Version Sent from Davis to Miller on August 8, 2017 at 9:18 A.M.</u> (*Id.* at 29): Two days later, Davis sends Miller clean and redlined versions of the MIPA "incorporating the changes which were previously discussed." The revised version includes the following Contingent Payment provision, with changes bolded:

6

      ○  **Upon the payment to SLEC of the amounts set forth in A., B., and C. above, the balance of $1,100,000 (the "Final Payment") due to SLEC shall be paid within thirty-six months from the Closing Date, or** upon the earlier of a transaction resulting in: (a) the sale, merger or liquidation of [Power Investments]; (b) the sale, merger or liquidation of Ashley [Energy]; or (c) the repayment or refinancing of the Arena Financing **((a), (b), and (c) each being defined as** an "Exit Event"**). [P]**rovided, however, **that if in the event that either (a) or (b) above occurs first, and [ ]** as a result of such Exit Event **as described in (a) or (b) [ ]** [Power Investments] receive**s, after payment of the Arena Financing debt**, total consideration less than $1,100,000, then the Final Payment shall be equal to 50% of the total consideration received by [Power Investments] as a result of the Exit Event. [Power Investments] shall use its best efforts to obtain an Exit Event that provides sufficient consideration to make the Final Payment. **(e)** Should **Mason Miller,** [Power Investments], **or any entity controlled or owned by Mason Miller or [Power Investments],** receive any **salary, payment, compensation, bonus, profit, distribution, dividend or other payment (collectively "Distributions")** from Ashley [Energy] prior to an Exit Event, 50% of any such **D**istributions shall be paid to SLEC and applied as a pre-payment to the Final Payment." (*Id.* at 32) (hereinafter "Version #3").[6]

- <u>Response to New Version from Miller to Davis on August 8, 2017 at 9:24 A.M.</u> (*Id.* at 45): E-mailing from his phone approximately six minutes later, Miller responds by noting "[t]wo minor changes" unrelated to the Contingent Payment provision. He states that he can "send over a signed copy this morning" if Davis makes those changes.

- <u>Reply from Davis to Miller on August 8, 2017 at 9:32 A.M.</u> (Doc. 203-1 at 298): Davis replies in full: "No problem, I'll make the changes." Davis is evidently referring to the two minor changes identified by Miller in the prior e-mail.

- <u>Phone Calls During the Morning of August 8, 2017</u>: The record reflects that Davis and Miller spoke on the phone twice during the morning of August 8, 2017, the calls lasting only a few minutes each. (Doc. 207-1 at 8). The parties dispute the content of these calls. Davis has stated that he and Miller "did not agree to any further revisions" to the Contingent Payment provision. (Doc. 207-2 at 3). During his deposition, Davis repeatedly indicated that he did not remember what was discussed during the call, but then clarified that he and Miller "did not have any conversations about changing" the Contingent Payment provision. (Doc. 207-1 at 13). Miller's declaration squarely contradicts this assertion, as Miller states that he "called Jim Davis to discuss the language and to let him know that I would not agree to his proposed amended language excluding refinancing as an Exit Event," and that Miller and Davis settled on revised language "to bring [the Contingent Payment provision] back in line with our original agreement." (Doc. 203-1 at 10). Miller further claims that Davis called back 45 minutes later "confirming that SLEC and Becker had agreed with the above language returning the terms back in line with our original agreement." (*Id.*). Miller has also provided a

---

[6] The MIPA including Version #3 incorporates other changes stemming from the 13 issues previously identified by Davis. (Doc. 207-2 at 31-37).

contemporaneous e-mail sent to Samuel Francis indicating that the phone call with Davis concerned the Contingent Payment provision. (Doc. 209-1).

- Follow-Up E-mail from Davis to Miller on August 8, 2017 at 12:05 P.M. (Doc. 207-2 at 47): Following these phone calls, Davis e-mails Miller a copy of the Assignment Agreement and notes, "[a]s per our phone call," that Davis had approved the MIPA e-mailed that morning. Davis offered the Assignment Agreement "on the condition that we receive an executed copy of the [MIPA]."

- Response from Miller to Davis on August 8, 2017 at 12:09 P.M. (Doc. 203-1 at 301): Miller responds in full: "Confirmed. Did you send the revised [MIPA]? I'll sign both right now." In his declaration, Miller insists that the "revised" MIPA referenced in his e-mail meant an MIPA which would have incorporated the changes to the Contingent Payment provision discussed in the phone calls that morning (among other edits). (*Id.* at 11).

- Follow-Up from Miller to Davis on August 8, 2017 at 12:19 P.M. (Doc. 207-2 at 54): Miller sends Davis signature pages for the MIPA "subject to making the changes we discussed." In his declaration, Miller again contends that the discussed changes included revisions to the Contingent Payment provision. (Doc. 203-1 at 11). In his deposition, Davis admits that there was no revised draft sent subsequent to the version sent on the morning of August 8, 2017 at 9:18 A.M. (Doc. 207-1 at 10-11), even though all parties agree that Miller had at minimum identified two required changes. (Doc. 207-2 at 45).

- Miller Mails Package of Closing Documents to Becker on August 15, 2017 (*Id.* at 11; Doc. 203-1 at 121): One week later, Miller mails a copy of all closing documents to Becker, including a copy of the allegedly final MIPA. The MIPA included in this package incorporates another revised Contingent Payment provision. (Doc. 133). Unsurprisingly, Plaintiffs deny that this is the final, agreed upon version. (Doc. 207 at ¶ 16). In the cover letter, Miller specifically notes that they had "never made the three changes agreed on [August] 8th concerning paragraph 1(D), paragraph 1(G) and paragraph 1(E), as well as insert the schedule A." (Doc. 203-1 at 122). Miller explains that he "went ahead and made those agreed to changes to conform to our agreement" and re-attached the signature pages. (*Id.*). Defendants have also provided a copy of Miller's credit card statement reflecting a FedEx charge on the date of August 15, 2017. (*Id.* at 123). Becker, meanwhile, states in a declaration that he never received the letter. (Doc. 207-7 at ¶ 3). The MIPA included in the closing documents has the following Contingent Payment provision, with changes from Version #3 bolded or struck out:

  o Upon the payment to SLEC of the amounts set forth in A., B., and C. above, the balance of $1,100,000 (the "Final Payment") due to SLEC shall be paid within thirty-six months from the Closing Date, or upon the earlier of a transaction resulting in: (a) the sale, merger or liquidation of [Power Investments]; (b) the sale, merger or liquidation of Ashley [Energy]; or (c) the repayment or refinancing of the Arena Financing ((a), (b), and (c) each being defined as an "Exit Event"), [P]rovided, however, that if ~~in the event that either (a) or (b) above occurs first,~~

and as a result of such Exit Event ~~as described in (a) or (b) [ ]~~ [Power Investments] receives, after payment of the Arena Financing debt, total consideration less than $1,100,000, then the Final Payment shall be equal to 50% of the total consideration received by [Power Investments] as a result of the Exit Event. [Power Investments] shall use its best efforts to obtain an Exit Event that provides sufficient consideration to make the Final Payment. (e) **After the closing of the Arena Financing, [s]**hould Mason Miller, [Power Investments], or any entity controlled or owned by Mason Miller or [Power Investments], receive any salary, payment, compensation, bonus, profit, distribution, dividend or other payment (collectively "Distributions") from Ashley [Energy] prior to an Exit Event, 50% of any such Distributions shall be paid to SLEC and applied as a pre-payment to the Final Payment. **This paragraph shall not apply to any payments made to Miller Wells PLLC.**" (Doc. 133 at 2) (hereinafter "Version #4).

To synthesize: Plaintiffs propose that the final MIPA was sent on August 8, 2017 at 9:18 A.M. and includes Version #3 of the Contingent Payment provision. (Doc. 207-2 at 38-43). Defendants respond that the final MIPA was not sent until August 15, 2017 and includes Version #4 of the Contingent Payment provision, among other changes. (Doc. 133). Defendants also argue that, at minimum, a contract which included Version #2 (and the additional 13 issues identified by Davis) existed because the parties manifested their agreement to such terms. (Doc. 209 at 2-3). Which version controls is critical because an Exit Event occurred in 2018 when Regions Bank refinanced the Arena Financing loan. (Doc 207 at ¶ 19).

A jury will be in the best position to resolve the numerous factual issues raised by this confusing negotiation. Both parties haphazardly sent signature pages without seeing a final document reflecting the supposedly agreed upon terms. Plaintiffs still cannot produce a truly final version of the MIPA which was sent to Defendants and incorporates the "two minor changes" both sides acknowledge were accepted. Either Miller or Davis is wrong about what transpired during the phone calls on the morning of August 8, 2017. A week after the transaction apparently closed, Miller mailed Becker closing documents including yet another new MIPA with material changes to key provisions, albeit changes allegedly agreed to during the August 8, 2017 phone calls. But

Becker insists he never received the package, and it does not appear that Defendants obtained confirmation of receipt.

Under Missouri law, the essential elements of any contract are offer, acceptance, and consideration. *Baker v. Bristol Care, Inc.*, 450 S.W.3d 770, 774 (Mo. banc 2014) (citation omitted).[7] Offer and acceptance "require there to be a mutual agreement, i.e., a meeting of the minds between the contracting parties, which means the parties meet upon and assent to the same thing, in the same sense, and at the same time." *EM Med., LLC v. Stimwave LLC*, No. ED 108965, 2021 WL 2420088, at *6 (Mo. Ct. App. June 15, 2021) (citations omitted); *see also Kunzie v. Jack-In-The-Box, Inc.*, 330 S.W.3d 476, 484 (Mo. Ct. App. 2010) (emphasis in original) ("A meeting of the minds occurs when there is a definite offer and an *unequivocal acceptance*."). In assessing whether a meeting of the minds occurred, "we look to the parties' objective manifestations of intent." *Best Buy Builders, Inc. v. Siegel*, 409 S.W.3d 562, 565 (Mo. Ct. App. 2013) (citation omitted); *see also Enter. Rent-A-Car Co. v. U-Haul Int'l, Inc.*, No. 4:03-CV-1480 CAS, 2007 WL 1063528, at *7 (E.D. Mo. Apr. 9, 2007) ("Defendants' subjective intent is irrelevant as to whether there was a meeting of the minds.").

Material factual disputes prevent this Court from determining precisely when a meeting of the minds existed as to the MIPA. There are three potential moments at which the parties may have reached a meeting of the minds. First, in response to the proposed MIPA including Version #2, Davis identified 13 substantive issues requiring further clarification and twice confirmed that such changes would be made to the "final draft." (Doc. 207-2 at 19-26). Under Missouri law, a contract "does not exist without a definite offer and a 'mirror-image' acceptance. Any acceptance that includes new or variant terms from the offer presented amounts to a counter-offer and a rejection

---

[7] All proposed versions of the MIPA include a choice of law provision stating that Missouri law controls, and both sides have consistently cited Missouri law in their briefing.

of the original offer." *Youngs v. Conley*, 505 S.W.3d 305, 314 (Mo. Ct. App. 2016) (citation omitted). This version of the MIPA does not constitute a contract because both parties repeatedly agreed that it did not reflect the final agreement. Davis' equivocal acceptance was conditioned on numerous edits to the MIPA. Miller subsequently confirmed that the parties would "finalize the document when time permits," further suggesting that the initial MIPA did not constitute a final contract. (Doc. 207-2 at 26-27).

In reply, Defendants argue that the e-mails unquestionably establish "that the parties had an agreement on the material terms of the MIPA" when Miller confirmed the 13 revisions on August 6, 2017. (Doc. 209 at 3). This might be true, but it does not objectively establish the existence of a contract when the parties have consistently referred to the future execution of a final draft. Instead, the parties objectively manifested they had an agreement "on terms" but would "finalize the document" later. (Doc. 207-2 at 26). Though it is difficult to find perfectly comparable precedent, courts have frequently held that references to a future final draft indicate the parties did not intend to enter a contract. *See, e.g., TLT Const. Corp. v. RI, Inc.*, 484 F.3d 130, 135 (1st Cir. 2007) (citation omitted) ("[T]he fact that the parties contemplate the execution of a final written agreement effects a strong inference that the parties do not intend to be bound by earlier negotiations or agreements until the final terms are settled."); *Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 262 (2d Cir. 1984) (collecting cases). The parties' subsequent course of conduct – namely, the exchange of additional drafts and negotiation over key provisions – provides further evidence that no meeting of the minds existed. *See Trendmasters, Inc. v. Walgreen Co.*, No. 95 C 5379, 1996 WL 422273, at *2-3 (N.D. Ill. July 24, 1996) (Noting that "proximity in time" of subsequent negotiation following alleged agreement "negates any inferences of a prior meeting of the minds."); *see also Radaszewski ex rel. Radaszewski v. Maram*, No. 01 C 9551, 2006 WL 861243, at *2-3 (N.D. Ill. Mar. 29, 2006). Finally, even if this Court determined that an agreement

11

existed on August 6, 2017, fact issues would exist as to whether the parties later executed a revised agreement.

Second, on the morning of August 8, 2017, Davis sent a revised version of the MIPA including Version #3 of the Contingent Payment provision and other substantial edits. (*Id.* at 29). Miller responded by noting that two minor changes were required. Two phone calls between Miller and Davis occur, though the parties offer completely contradictory summaries of the calls. Miller proceeds to send signature pages "subject to making the changes we discussed." (*Id.* at 54). It is plausible that the parties reached an agreement during these phone calls. Because the parties disagree as to the content of the calls, however, material factual disputes prevent this Court from determining the precise nature of whatever contract existed at this juncture. A reasonable person could not interpret Miller's sending of the signature pages as an objective manifestation of intent to accept the version sent by Davis that morning because Miller clearly offered the signatures subject to additional changes being incorporated.

Finally, on August 15, 2017, Miller allegedly mails Becker a package containing yet another revised MIPA, this time incorporating Version #4 of the Contingent Payment provision. "Silence generally cannot be translated into acceptance" under Missouri law. *Guidry v. Charter Commc'ns, Inc.*, 269 S.W.3d 520, 528 (Mo. Ct. App. 2008) (citation omitted). In certain circumstances, however, the manifestation of acceptance of an offer need not be made by the spoken or written words; it may also come through the offeree's conduct or failure to act. *Moore v. Kuehn*, 602 S.W.2d 713, 718 (Mo. Ct. App. 1980) (citation omitted); *see also Citibank (South Dakota), N.A. v. Wilson*, 160 S.W.3d 810, 813 (Mo. Ct. App. 2005). If Becker actually received the revised version of the MIPA within the closing documents and proceeded to perform as if the parties had executed a final agreement, a reasonable argument could be made that his inaction constituted acceptance of the revised contract. But Becker insists that he never received the

12

package sent by Miller. Once again, a material factual dispute precludes this Court from finding that the MIPA included in the closing documents package constitutes an agreed upon contract.

"Whether there was a meeting of the minds is a question of fact for the fact finder." *Tom's Agspray, LLC v. Cole*, 308 S.W.3d 255, 259 (Mo. Ct. App. 2010) (internal quotations omitted); *see also Miller v. Securitas Sec. Servs. USA Inc.*, 581 S.W.3d 723, 729 (Mo. Ct. App. 2019) (citation omitted). Viewing the evidence in the light most favorable to Plaintiffs, a reasonable juror could conclude that a meeting of the minds existed as to an MIPA incorporating Version #3 of the Contingent Payment provision, but not the MIPA incorporating Version #4 (or vice versa). Resolution of this question will turn primarily on credibility determinations, and such determinations fall squarely within the province of the jury. *See Keveney v. Mo. Mil. Acad.*, 304 S.W.3d 98, 105 (Mo. banc 2010) (citation omitted) ("The jury is the sole judge of the credibility of witnesses and the weight of their testimony and may believe or disbelieve any portion of that testimony."); *see also DocMagic, Inc. v. Mortg. P'ship of Am., LLC*, No. 4:09-CV-1779 MLM, 2012 WL 263091, at *5 (E.D. Mo. Jan. 30, 2012) ("It was the jury's function to weigh the evidence and the credibility of the witnesses and it is not the court's role to usurp this function.").

Courts in this district have declined to grant summary judgment where factual issues regarding formation exist, particularly when parties offer contrasting accounts of key events. *See Union Elec. Co. v. Gen. Elec. Int'l, Inc.*, No. 4:06-CV-319 ERW, 2007 WL 1125700, at *4 (E.D. Mo. Apr. 16, 2007) (After discussing disagreement over whether phone call occurred, holding that "as this provides conflicting testimony, an order of summary judgment in favor of Defendant would be inappropriate on this issue."); *see also Crosby Legacy Co., LLC v. TechnipFMC LLP*, No. 18-10814-MLW, 2019 WL 5588993, at *8 (D. Mass. Sept. 13, 2019) ("The intent of the parties is generally a question of fact because the determination of whether parties intended to be bound must be premised on the totality of such expressions and deeds given the attendant

13

circumstances."). Because this Court cannot identify the true MIPA as a matter of law, it will only grant summary judgment in favor of Defendants on a given count if the claim fails under either side's proposed version.

*Count III(a) – Becker and SLEC's Breach of Contract Claim Against Power Investments*

In Count III(a) of the SAC, Becker and SLEC allege that Power Investments breached numerous provisions in the MIPA. Certain claims are duplicative of other counts in the SAC (*e.g.*, breach of the mutual release provision). This Court will consider whether summary judgment is warranted as to each of the alleged breaches while deferring analysis of those claims raised later in the SAC.

First, Plaintiffs allege that Power Investments breached §§ 1.E and 5.A of the MIPA by directing cash transfers (the "Cash Transfers") totaling $479,970.00 to Miller and Miller Wells. (Doc. 90 at ¶¶ 47, 77(a)). The proposed versions of § 1.E are relatively similar and provide that Miller or Power Investments may not receive any distribution from Ashley Energy prior to an Exit Event, otherwise 50% of such distribution must be applied as a pre-payment to SLEC. Power Investments represents in § 5.A that except for the Arena Financing "there are no other agreements or preferences regarding distributions or dividends, liens, encumbrances, or obligations of [Power Investments] which would supersede or impair the ability of [Power Investments] to comply with the terms of this Agreement, or the payments to the SLEC parties." (Doc. 133 at 4; Doc. 207-2 at 41).

For the reasons discussed below as to Count III(b), summary judgment in favor of Power Investments is warranted as to this claim. Becker's deposition testimony and evidence in the record unquestionably establishes that the Cash Transfers were agreed upon by all parties prior to the closing. The Cash Transfers could not "impair the ability of [Power Investments] to comply with

14

the Agreement" because they were specifically contemplated in negotiating the MIPA. On this motion for summary judgment, Plaintiffs have not offered any evidence contradicting the facts set out by Defendants as to the Cash Transfers. Therefore, summary judgment will be granted as to ¶ 77(a-b) of the SAC.

Second, Plaintiffs allege that Ashley Energy violated § 1.F by failing to deliver monthly financial statements. (Doc. 90 at ¶ 77(c)). In all versions of the MIPA, however, § 1.F merely provides that SLEC "shall be entitled to *receive* monthly financial statements." (Doc. 133 at 2; Doc. 207-2 at 39) (emphasis added). This Court agrees with Defendants that, under the plain, unambiguous language of this provision, Power Investments was only required to provide monthly financial statements upon request. (Doc. 204 at 15). This is consistent with follow-up language in the provision stating that SLEC also had a "right to inspect the books and records." (Doc. 207-2 at 39). Because SLEC has not claimed that it was denied the right to review financial statements or inspect the books and records, there is no plausible allegation of breach. In response to a Statement of Material Facts from Defendants that "SLEC never requested monthly financial statements," Plaintiffs only respond by "deny[ing] that they were required to make requests." (Doc. 207 at ¶ 45). This Court interprets this as an admission that no such requests were made and will accordingly grant summary judgment in favor of Power Investments on this claim. The Court also finds that Plaintiffs have abandoned this claim by entirely failing to address it in their response to Defendants' motion for summary judgment. *See Satcher v. Univ. of Arkansas Pine Bluff Bd. of Trustees*, 558 F.3d 731, 735 (8th Cir. 2009).[8]

---

[8] In *Satcher*, the Eighth Circuit held that "failure to oppose a basis for summary judgment constitutes waiver of that argument." 558 F.3d at 735. The Eighth Circuit recently affirmed that a plaintiff waives her claim when she fails to oppose summary judgment arguments "because the non-moving party is responsible for demonstrating any genuine dispute of material fact that would preclude summary judgment." *Paskert v. Kemna-ASA Auto Plaza, Inc.*, 950 F.3d 535, 540 (8th Cir. 2020) (citation omitted). Plaintiffs have completely failed to respond to numerous arguments raised by Defendants, rendering Plaintiffs' underlying claims as to those arguments waived.

Third, Plaintiffs allege that Power Investments violated § 1.B of the MIPA, where it agreed to "release, waive, cancel and surrender the [Power Investments] Loan and Deed of Trust." (Doc. 90 at ¶ 77(d)). Plaintiffs admit that Power Investments has represented that the loan and deed of trust have been canceled but complain that Power Investments "has never returned the original note and deed of trust, and as a result SLEC and Becker cannot know that the originals have not been transferred to a third party." (Doc. 207 at ¶ 44). Plaintiffs offer no legitimate grounds for their concern that the note and deed of trust have not been canceled and have certainly not done "more than simply show that there is some metaphysical doubt as to the material facts." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (internal quotations omitted). Summary judgment will be granted in favor of Power Investments as to ¶ 77(d) of the SAC.[9]

Fourth, Plaintiffs allege that Power Investments "failed to pay the vendors as agreed" (Doc. 90 at ¶ 77(e)) in violation of § 1.G of the MIPA, which provides that as part of the consideration, Power Investments agreed to assume responsibility for certain expenses and obligations incurred by SLEC and outlined in Exhibit A.[10] At the outset, the Court notes that the proposed final version of the MIPA offered by Plaintiffs does not actually include Exhibit A; Miller attached Exhibit A when he allegedly sent the closing documents package on August 15, 2017. Beyond that, Plaintiffs have not clarified which vendors Power Investments failed to pay, nor suggested that those vendors have come after Plaintiffs due to Power Investments' supposed failure. In fact, Plaintiffs did not offer any response to Defendants' motion for summary judgment on this issue. Therefore, this Court finds that summary judgment in favor of Power Investments is warranted as to ¶ 77(f)

---

[9] Defendants also claim that Becker never actually provided originals of these documents. In a post-closing e-mail, Miller mentioned that he did "not have the originals" because they "were never delivered" to him by Becker. (Doc. 203-1 at 256).

[10] Count III(a) is only directed against Power Investments, but one of the "two minor changes" identified by Miller and allegedly agreed to by Davis on August 8, 2017 was that Ashley Energy would accept these obligations.

16

because Plaintiffs have not come forward with specific facts showing there is a genuine issue for trial and, alternatively, have abandoned this claim. *See Satcher*, 558 F.3d at 735.

Fifth, Plaintiffs allege in ¶ 77(f) of the SAC that, again pursuant to § 1.G of the MIPA, Power Investments agreed to provide a schedule for reimbursement to SLEC for expenses related to Dan Dennis. In Plaintiffs' version of the MIPA, § 1.G(a) states that as to Dan Dennis, Power Investments "shall propose a schedule of repayment and reimbursement to SLEC to occur within seven (7) months from the Closing Date" regarding $87,000 owed. (Doc. 207-2 at 40). The parties simply do not address this allegedly outstanding $87,000 payment in their briefing. E-mails attached to Plaintiffs' SAC confirm the parties' apparent intent that Defendants would reimburse Becker for $87,000 advanced to Dan Dennis, but such repayment would be due in seven months so that the Plant would be "into cold enough weather to have excess cash flow." (Doc. 90-1 at 16-17). In an e-mail after the closing, Miller confirmed that Defendants would "honor the obligations" of the MIPA by paying Dan Dennis but noted that they had more time to comply. This Court will deny summary judgment as to ¶ 77(f) of the SAC because Defendants have not put forth any argument as to this payment.

Sixth, Plaintiffs allege in ¶¶ 77(g-h) and 78(f) of the SAC that Power Investments breached the mutual release provision by pursuing litigation in Kentucky. This claim is duplicative of Count X, and summary judgment will be granted in favor of Power Investments for the reasons discussed below as to Count X. To summarize, summary judgment will be granted in favor of Power Investments as to all claims raised in Count III(a) of the SAC with the exception of ¶ 77(f), which contends that Power Investments has breached § 1.G(a) of the MIPA by failing to reimburse SLEC for $87,000 owed to Dan Dennis.

*Count VI*

In Count VI, Becker and SLEC again allege breach of contract against Power Investments, this time for failing to make the $1.1 million Contingent Payment (¶ 119) or provide monthly financial statements and notice of the Regions Bank refinancing (¶ 120). The second claim is essentially duplicative of the breach of contract claim raised in ¶ 77(c) of Count III(a), and summary judgment will be granted in favor of Power Investments for the same reasons discussed above.

The claim concerning the Contingent Payment is the real thrust of this lawsuit, and the Court must deny summary judgment because this question goes squarely to which version of the MIPA controls. Both parties agree that an "Exit Event occurred in 2018 when the Arena Financing was refinanced by Regions Bank." (Doc. 207 at ¶ 19). Both proposed versions of the MIPA identify three potential Exit Events: (a) a sale, merger, or liquidation of Ashley Energy; (b) a sale, merger, or liquidation of Power Investments; and (c) a refinancing of the Arena Financing. Under Defendants' MIPA, which incorporates Version #4 of the Contingent Payment provision, any Exit Event in which Power Investments received (after payment of the Arena Financing debt) less than $1.1 million would result in the Contingent Payment being reduced from $1.1 million to 50% of the total consideration received. (Doc. 133 at 2). Under Plaintiffs' version of the MIPA, which incorporates Version #3 of the Contingent Payment provision, *only Exit Events (a) and (b) would potentially result in such a reduction of the Contingent Payment provision*, while refinancing of the Arena Financing is specifically carved out. (Doc. 207-2 at 39). Because both parties agree that that the 2018 Regions Bank refinancing constituted an Exit Event, which MIPA controls is dispositive of the Contingent Payment claim and this Court must deny summary judgment.[11]

---

[11] Plaintiffs also argue that summary judgment is not warranted even if this Court accepts Defendants' version of the MIPA because Ashley Energy received additional consideration through the Regions Bank refinancing. Specifically, Plaintiffs claim that pursuant to the Loan Services Agreement ("LSA") with Regions Bank (Doc. 207-3), Ashley

*Count VII*

In Count VII of the SAC, Becker and SLEC again allege that Power Investments breached the MIPA. This time, Plaintiffs argue that the Arena Financing itself constituted a sale of Ashley Energy and therefore an Exit Event under the Contingent Payment provision of the MIPA. (Doc. 90 at ¶¶ 121-131). Simply put, Plaintiffs' argument would result in a nonsensical interpretation of the MIPA. *See Storey v. RGIS Inventory Specialists, LLC*, 466 S.W.3d 650, 655 (Mo. Ct. App. 2015) (citation omitted) ("It is preferable to attribute a reasonable meaning to each clause and harmonize all provisions, rather than leave some provisions nonfunctional or nonsensical.").

Under Plaintiffs' own proposed version of the MIPA, potential Exit Events include the sale or merger of Power Investments, the sale or merger of Ashley Energy, and repayment or refinancing of the Arena Financing. In Count VII, Plaintiffs argue that the Arena Financing *itself*, not its refinancing by Regions Bank, constituted a sale of Ashley Energy. Plaintiffs have admitted, moreover, that "Power Investments received no payment as a result of the Arena Financing and the Arena Financing remained due" until it was paid back through the Regions Bank refinancing. (Doc. 207 at ¶ 24). There is no reasonable interpretation of either parties' proposed MIPA permitting a finding that the Arena Financing itself constituted a sale of Ashley Energy under § 1.D. Plaintiffs have also abandoned this argument by entirely failing to respond to Defendants' motion for summary judgment on this count. *See Satcher*, 558 F.3d at 735. For these reasons, summary judgment will be granted in favor of Power Investments on Count VII of the SAC.

---

Energy obtained (i) a $1 million line of credit and (ii) $409,183.19 to advance to parties involved in the refinancing transaction. This Court declines to address this argument considering it presents clear issues of fact and Count VI will proceed regardless.

*Count X*

In Count X of the SAC, Plaintiffs contend that Power Investments breached § 2 of the MIPA by filing a civil lawsuit in Kentucky alleging various causes of action relating to the Plant acquisition. (Doc. 90 at ¶¶ 171-75). Both versions of the MIPA include § 2, which is entitled "Mutual Release" and provides that all parties release each other from "any and all past, present, or future demands, actions causes of action . . . by reason of and/or related to Ashley [Energy], the [ ] Plant, the [Assignment] Agreement, and the [Power Investments] Loan and Deed of Trust." Prior to the start of litigation in this Court, Power Investments brought claims against SLEC and Becker in Kentucky state court for fraudulent inducement and fraudulent misrepresentation (Count I), unjust enrichment (Count II), and declaratory judgment (Count III) (generally, the "Kentucky Action"). (Doc. 203-1 at 16-32; Doc. 207 at ¶¶ 47-49).[12]

Power Investments argues that no element of the Kentucky Action violates the mutual release provision because a contract cannot waive claims for fraudulent inducement (Count I), the unjust enrichment stemmed directly from the alleged fraud (Count II), and the mutual release provision specifically states that "nothing in this paragraph shall be construed to release any right of the Parties to enforce the terms" of the MIPA (Count III). (Doc. 204 at 20-21). Plaintiffs essentially respond by attempting to distinguish the precedent offered by Power Investments.

Under Missouri law, parties "may not, by disclaimer or otherwise, contractually exclude liability for fraud in inducing the contract." *Hess v. Chase Manhattan Bank, USA, N.A.*, 220 S.W.3d 758, 767 (Mo. banc 2007); *see also Robson v. Duckpont Ltd.*, 4:19-CV-1862-SRC, 2021 WL 1222429, at *6 (E.D. Mo. Mar. 31, 2021). Plaintiffs argue that this rule only applies to "general releases" and "cannot be analogized to the mutual release" included in the MIPA. (Doc. 208 at 9).

---

[12] This Court previously discussed the Kentucky Action in substantial detail when addressing Defendants' motion to dismiss. (Doc. 89).

Plaintiffs offer no precedent supporting this distinction, and the Missouri Supreme Court's holding in *Hess* broadly recognizes that parties cannot, "by disclaimer *or otherwise*," release claims for fraudulent inducement. *Id.* (emphasis added). It is readily apparent, and Plaintiffs do not explicitly deny, that Counts I and II of the Kentucky Action concern Power Investments' fraudulent inducement claim. The unjust enrichment claim includes minimal additional factual allegations but instead seeks damages for SLEC and Becker's alleged fraudulent inducement. (Doc. 203-1 at 30). Finally, Plaintiffs offer no response to Defendants' reasonable argument that the mutual release clause expressly permits Count III of the Kentucky Action. Because Missouri law does not recognize the contractual release of fraudulent inducement claims and the MIPA permits the declaratory judgment claim, this Court determines as a matter of law that Power Investments has not breached § 2 of the MIPA. Therefore, summary judgment will be granted in favor of Power Investments on Count X of the SAC.

B.  Claims Concerning D&G's Legal Fees (Counts I and II)

Because this Court has dismissed Counts I and II with prejudice as a sanction for D&G's intentional destruction of discoverable evidence (Doc. 212), Defendants' motion for summary judgment will be denied as moot as to Counts I and II.

C.  Fraudulent Conveyance (Counts III(b), IV, V)

In Count III(b) of the SAC, Plaintiffs allege that Ashley Energy fraudulently transferred $479,970 to Miller and Miller Wells on August 10, 2017. (Doc. 90 at ¶¶ 80-95). Plaintiffs seek to void this transfer pursuant to MO. REV. STAT. § 428.039. Though the SAC does not cite the particular statute, MO. REV. STAT. § 428.024.1 provides that a transfer is fraudulent as to a creditor when made: (1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the

21

debtor (a) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (b) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due. The statute identifies 11 "badges of fraud" courts may consider when assessing intent. MO. REV. STAT. § 428.024.2.[13]

Whether a transferor had fraudulent intent is a question of fact. *See Curtis v. James*, 459 S.W.3d 471, 475 (Mo. Ct. App. 2015). But "[i]ntent to defraud must be shown by clear and convincing evidence," *Birkenmeier v. Keller Biomedical, LLC*, 312 S.W.3d 380, 389 (Mo. Ct. App. 2010), and "[f]raud is never presumed when the transaction may fairly be reconciled with honesty." *Higgins v. Ferrari*, 474 S.W.3d 630, 636 (Mo. Ct. App. 2015) (citation omitted). "Fraudulent transfer law focuses on the intent of the debtor. If the debtor transfers its assets with the intent to defraud its creditors, the transfer can be avoided as fraudulent." *Ritchie Cap. Mgmt., LLC v. Stoebner*, 779 F.3d 857, 862 (8th Cir. 2015). Generally, "[f]or a transfer to be found fraudulent, several indicia of fraud must be shown. More than one badge of fraud must be present." *Birkenmeier*, 312 S.W.3d at 389 (citation omitted).

At the outset, the Court finds that Plaintiffs have admitted multiple key statements of material fact. Pursuant to E.D. Mo. L.R. 4.01(E), every memorandum in opposition to a motion for summary judgment must include a response to the statement of material facts. "All matters set forth in the moving party's Statement of Uncontroverted Material Facts shall be deemed admitted

---

[13] The badges of fraud are: (1) the transfer or obligation was to an insider; (2) the debtor retained possession or control of the property after the transfer; (3) the transfer or obligation was disclosed or concealed; (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) the transfer was of substantially all the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) the debtor was insolvent shortly after the transfer was made or the obligation was incurred; (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor. MO. REV. STAT. § 428.024.2.

for purposes of summary judgment unless specifically controverted by the opposing party." *Id.* In its SMF, Defendants include key statements regarding the Cash Transfers at issue and offer citation to affidavits and other exhibits as supporting evidence. (Doc. 203 at ¶¶ 39-43). Plaintiffs offered the following response to each statement: "Plaintiff objects that this purported fact is not adequately supported as required by Rule 56, in that the exhibits cited . . . do not support this statement. The assertions in the motion are meaningless unless supported as provided for by rule. *Jacobson v. Maryland Cas. Co.*, 336 F.2d 72, 75 (8th Cir. 1964)." This response is insufficient, includes no citations to contrary evidence, and ignores that Defendants included clear citations to supporting evidence. Accordingly, the Court finds that Plaintiffs have admitted ¶¶ 39-43 of Defendants' Statement of Material Facts. *See Wagner v. Brown*, No. 4:15-CV-1277-JAR, 2017 WL 3433630, at *1 n.2 (E.D. Mo. Aug. 10, 2017). As to ¶ 43, in which Defendants state that as a result of the Cash Transfers "Becker and SLEC no longer owe the $479,970 to Mason Miller and Sam Francis," Plaintiffs actually offer no response whatsoever. (Doc. 207 at ¶ 43).

Considering the admitted facts and deposition testimony by Becker, a reasonable jury could not conclude that the Cash Transfers were made with fraudulent intent or without receiving any consideration. The Cash Transfers totaled $479,970 and consisted of three separate (re)payments: (1) $10,980 advance by Miller on the Plant's natural gas bill; (2) $335,638.77 in cancellation of a promissory note; and (3) $133,251.23 in fees due to Power Investments. (Doc. 149 at 17). The undisputed material facts establish that SLEC and Becker owed this aggregate amount to Power Investments, Miller, and Sam Francis. (Doc. 207 at ¶ 41). The undisputed facts further establish that Plaintiffs "negotiated for the payment of $479,970 of Becker and SLEC's debt" as part of the Plant acquisition. (*Id.* at ¶ 42). Finally, the undisputed facts provide that as a result of the Cash Transfers, Becker and SLEC no longer owe $479,970 to Mason Miller and Sam Francis. In short,

the undisputed facts make perfectly clear that the Cash Transfers constituted a fully negotiated, expected repayment of money owed and lacked any fraudulent intent.

The following exchange during Becker's deposition eliminates any potential doubt on this issue:

> QUESTION: Mr. Becker, there was a discussion, I think in the complaint you asserted that Mason Miller made payments to, and received payments that you called fraudulent transfer. I'd like to ask you about the three payments that were, that that was a part of. Do you agree that SLEC and Mike Becker owed Mason Miller roughly, roughly $300,000 as part of this transaction?
>
> ANSWER: Yes.
>
> QUESTION: And do you agree that SLEC and Mike Becker owed Sam Francis approximately somewhere between 130 and $200,000 in, loan proceeds? Or in – owed them a loan amount of or payment amount of 130 to like $200,000 roughly?
>
> ANSWER: Yes.
>
> . . .
>
> QUESTION: During the closing period, wasn't it true that to keep the gas, to keep the gas flowing, there was a requirement, an ask of Mason Miller to pay $10,000 to the gas company to cover the closing days? Is that true?
>
> ANSWER: I'd have to take a look at that, do you have that, that document in front of you?
>
> QUESTION: You don't recall whether Mason Miller was asked to pay for the gas for Ashley Energy to keep, keep the lights on and the energy going?
>
> ANSWER: I do, yes, yes.
>
> QUESTION: Okay.
>
> ANSWER: There was, there was a payment, mm-hmm.
>
> QUESTION: After the – isn't it true that after the closing, you no longer owe Power Investments and Mason Miller the roughly $300,000?
>
> ANSWER: That is true, he was paid back in full with interest; yes sir.
>
> QUESTION: Okay. And, and isn't it true that after the closing Sam Francis also you no longer, you and SLEC no longer owe the Sam Francis amount, as well?

24

QUESTION: ANSWER: That is true.

QUESTION: And the same thing for the gas bill, you don't owe any money for the gas bill, the $10,000, roughly $10,000 gas bill?

ANSWER: No.

QUESTION: Okay, so you received the benefit of not owing these things by virtue of the closing?

ANSWER: Yes, sir. (Doc. 203-1 at 40-42).

In this exchange, Becker fully admits that he and SLEC owed debts to Miller and Sam Francis, and that the Cash Transfers cleared the debts. The Court cannot comprehend how Plaintiffs can plausibly allege that the Cash Transfers were fraudulent despite repeatedly admitting that they constituted repayment for agreed upon debts. Plaintiffs offer a mere two sentences in response on this issue, contending that Defendants' material facts are unsupported and "there is no explanation for why Miller was using funds borrowed by Ashley to repay debts owed to himself." (Doc. 208 at 8). The undisputed material facts establish, however, that Plaintiffs substantially benefitted from the Cash Transfers and all parties contemplated the transfers in advance of the closing.

Briefly considering the badges of fraud, Plaintiffs allege in the SAC that (a) the Cash Transfers were made to an insider; (b) Ashley Energy transferred all of its available cash; (c) Ashley Energy received no consideration; (d) Ashley Energy was insolvent after the Cash Transfers; and (e) the Cash Transfers were made shortly before Ashley Energy incurred substantial debt. (Doc. 90 at ¶ 91). While the Cash Transfers were made to an insider, no other badges of fraud identified by Plaintiffs suggest fraudulent intent. There is no evidence that Ashley Energy transferred all available cash or became insolvent. The record firmly establishes that the Cash Transfers constituted consideration for cancellation of outstanding loans owed by Becker and SLEC, Ashley Energy's prior owners. The incurrence of the Arena Financing has no bearing on

25

this Court's fraudulent transfer analysis, as it was clearly contemplated by all parties at the time of the Cash Transfers. *See In re Wright*, 611 B.R. 319, 326 (Bankr. W.D. Mo. 2019) (finding that certain badges of fraud, while technically present, had "logical explanations"). Missouri precedent clearly provides that "the presence of one badge alone does not support a finding of actual intent to defraud." *In re Seitz*, 400 B.R. 707, 714 (Bankr. E.D. Mo. 2008). Considering the badges of fraud, a reasonable factfinder could not conclude that the Cash Transfers were made with fraudulent intent.

When previously denying summary judgment on this count, the Court stated that the Cash Transfers "may not have been inherently fraudulent, but instead only fraudulent to the extent that Ashley Energy intended to prevent Becker, SLEC, and D&G from subsequent recovery and potentially violate § 5.A of the MIPA." The undisputed facts now establish, however, that the Cash Transfers constituted repayment of legitimate, negotiated debts, and all parties expected the Cash Transfers to be made following closing. (Doc. 203-1 at 86, 104-109, 114). Ultimately, "[f]raudulent transfer law focuses on the intent of the debtor." *Stoebner*, 779 F.3d at 862. Having extensively considered the undisputed material facts surrounding the Cash Transfers and analyzed the badges of fraud, this Court will grant summary judgment in favor of Defendants on Count III(b) of the SAC.

D.  Tortious Interference (Count IX)

In Count IX of the SAC, Plaintiffs allege that Defendants have committed tortious interference. Plaintiffs claim that Ashley Energy applied for and obtained PACE funding from the Clean Energy Development Board of the City of St. Louis and failed to disclose the Kentucky Action or general disputes relating to the MIPA. Plaintiffs confusingly summarize their claim by stating that as "a direct result of Defendant Miller, Miller Wells, and Ashley [Energy's] intentional

26

interference with contract between Becker, SLEC, and [Power Investments], [Power Investments] failed to pay" the Contingent Payment. (Doc. 90 at ¶ 169).

A claim for tortious interference of contract under Missouri law requires "(1) a contract or valid business expectancy; (2) defendant's knowledge of the contract or relationship; (3) a breach induced or caused by defendant's intentional interference; (4) absence of justification; and (5) damages." *Bishop & Assocs., LLC v. Ameren Corp.*, 520 S.W.3d 463, 472 (Mo. banc 2017). This Court is unclear how Plaintiffs could have any claim for tortious interference as to alleged misstatements by Defendants in the course of obtaining the PACE funding. Summary judgment will be granted on Count IX because Plaintiffs have offered no logical connection between the PACE funding and the alleged breach of the MIPA. Alternatively, this Court grants summary judgment in favor of Defendants on Count IX because Plaintiffs failed to offer any response to Defendants' motion on this issue and thereby abandoned the claim. *See Satcher*, 558 F.3d at 735.[14]

IV.     **CONCLUSION**

Construing all evidence in the light most favorable to Plaintiffs, this Court finds that genuine disputes of material fact require a jury to answer one key factual question: at what point did the parties have a meeting of the minds on the MIPA, and therefore which version of the MIPA controls? Because genuine disputes of material fact exist on this issue, summary judgment will be denied as to Counts III(a) (as to ¶ 77(f) only) and VI of the SAC. Summary judgment will also be denied as to Count VIII, which seeks remedies in connection with the alleged breach of contract.

---

[14] The Court also notes that, as a matter of law, Miller cannot be held liable for tortious interference as to the MIPA because he was signatory to the MIPA as an officer of Power Investments. *See Farrow v. Saint Francis Med. Ctr.*, 407 S.W.3d 579, 602 (Mo. banc 2013)

As to the remainder of the SAC, however, summary judgment in favor of Defendants is appropriate regardless of how a jury resolves this outstanding factual question. In Counts III(a) (except as to ¶ 77(f) of the SAC), VII, IX, and X, Plaintiffs make claims for breach of contract which fail as a matter of law under any version of the MIPA. Plaintiffs' fraudulent conveyance claim (Count III(b)) cannot succeed because the undisputed material facts demonstrate that the Cash Transfers were legitimate, negotiated repayments of outstanding debts as agreed upon by the parties. Counts IV and V merely seek remedies in connection with the fraudulent conveyance claim. Finally, Plaintiffs have failed to explain how Defendants' alleged misstatements in the course of obtaining PACE funding establish a claim for tortious interference as to the MIPA (Count IX). Plaintiffs have abandoned many of these claims by declining to respond to Defendants' arguments. The Court will grant summary judgment in favor of Defendants on Counts III(a) (except as to ¶ 77(f)), III(b), IV, V, VII, IX, and X.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (Doc. 201) is **GRANTED in part** and **DENIED in part**:

- Summary judgment is **GRANTED** in favor of Defendants on Counts III(a) (except as to ¶ 77(f) of the SAC), III(b), IV, V, VII, IX, and X, and such counts are **DISMISSED with prejudice**.

- Summary judgment is **DENIED as moot** as to Counts I and II. (Doc. 212).

- Summary judgment is **DENIED** in all other respects. Therefore, the only counts remaining in the SAC are Count III(a) (as to ¶ 77(f) only), Count VI, and Count VIII.

Dated this 21st day of September, 2021.

*John A. Ross*
JOHN A. ROSS
UNITED STATES DISTRICT JUDGE

28